## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IBA, LLC, a Delaware limited liability company | ) ) ) | |
| Plaintiff, | ) ) | 07 C 6219 |
| vs. | ) ) | Honorable Judge Wayne R. Andersen |
| GANESAN VISVABHARATHY, an individual | ) ) ) | |
| Defendant | ) ) | |

### MOTION FOR DEFAULT

Plaintiff, IBA, LLC ("Plaintiff"), by and through its attorneys, Levenfeld Pearlstein, LLC, hereby files this Motion for Default against Defendant, GANESAN VISVABHRATHY ("Defendant"), for his failure to appear or file an answer or responsive pleading. In support thereof, Plaintiff states as follows:

1.     On November 2, 2007, Plaintiff filed its Complaint for breach of guaranty (the "Complaint"). A copy of the Complaint is attached hereto as Exhibit "A".

2.     On December 1, 2007, Defendant was served by substitute service Summons and Complaint. A copy of the Summons is attached hereto as Exhibit "B".

3.     Defendant's Answer to Plaintiffs' Complaint was due on December 21, 2007.

4.     As of January 2, 2008, Defendant has failed to file an appearance or answer. A copy of the Plaintiff's Attorney's Affidavit of Defaulted Parties is attached hereto as Exhibit "C".

WHEREFORE, Plaintiff, IBA, LLC, respectfully requests this Court enter an Order;

A)   Defaulting Defendant for his failure to appear or file Answer or responsive pleading;

B)   Setting a hearing date for prove-up of damages;

C)   Granting such further relief as this Court deems just and appropriate.

Respectfully submitted,

**IBA, LLC**

By:  _/s/ James G. Martignon____
One of Its Attorneys

Gary I. Blackman (ARDC #6187914)
James G. Martignon (ARDC #6277974)
LEVENFELD PEARLSTEIN, LLC
2 N. LaSalle St., Suite 1300
Chicago, Illinois 60602
(312) 346-8380 - Telephone
(312) 346-8434 – Facsimile
gblackman@lplegal.com
jmartignon@lplegal.com

2

## CERTIFICATE OF SERVICE

I hereby certify that on January 2, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and I hereby certify that I have mailed by United States Postal Service the document to the following:

Ganesan Visvabharathy
7529 Ridgewood Lane
Burr Ridge, IL 60527

/s/ James G. Martignon
James G. Martignon (ARDC #6277974)
LEVENFELD PEARLSTEIN, LLC
2 N. LaSalle St., Suite 1300
Chicago, Illinois 60602
(312) 346-8380 - Telephone
(312) 346-8434 – Facsimile
jmartignon@lplegal.com

# EXHIBIT A

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IBA, LLC, a Delaware limited liability company, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| GANESAN VISVABHARATHY, an individual, | ) ) ) ) |
| Defendant. | ) ) |

07C 6219

JUDGE ANDERSEN

MAGISTRATE JUDGE KEYS

RECEIVED

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

### COMPLAINT

NOW COMES Plaintiff, IBA, LLC, a Delaware limited liability company ("IBA"), by and through its attorneys Gary I. Blackman and James G. Martignon with Levenfeld Pearlstein, LLC, and for its Complaint against Ganesan Visvabharathy, an individual ("Visvabharathy"), respectfully states as follows:

### Parties

1.    IBA is a Delaware limited liability company with its primary place of business located in Pasadena, California.  IBA's sole member is IndyMac Bancorp, Inc., a Delaware corporation with its principal place of business located in California.

2.    Visvabharathy, an individual, is a citizen of the State of Illinois, and a resident of Burr Ridge, Illinois.

### Jurisdiction and Venue

3.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship between Plaintiff, a citizen of the State of

Delaware and California, and Defendant Visvabharathy, a citizen of the State of Illinois. The amount in controversy is in excess of $75,000, exclusive of fees and costs.

4.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(a)(1) and (2) in that this Complaint is being brought in the judicial district where Defendant resides and a substantial part of the events and omissions giving rise to this claim occurred in this district.

### Facts Common to All Counts

5.     On or about July 28, 2005, IBA extended a loan to Bluff House, LLC, an Illinois limited liability company ("Bluff House"), and Anastasia Shores, LLC, an Illinois limited liability company ("Anastasia"), in the principal amount of $9,500,000.00, secured by a Promissory Note (the "Note"), which IBA, Bluff House and Anastasia executed pursuant to their Loan Agreement (the "Agreement"), for the purpose of funding the development of real property. A copy of the Note is attached hereto as Exhibit 1 and incorporated herein by reference. A copy of the Agreement is attached hereto as Exhibit 2 and incorporated herein by reference.

6.     At all relevant times, Visvabharathy was the Manager of Bluff House.

7.     At all relevant times, Visvabharathy was the Manager of Anastasia.

8.     In order to induce IBA to make the loan to Bluff House and Anastasia, Visvabharathy executed a General Guaranty (the "Guaranty"), wherein Visvabharathy agreed to repay all monies owed to IBA under the Note. A copy of the Guaranty is attached hereto as Exhibit 3, and incorporated herein by reference.

9.     Visvabharathy agreed, *inter alia*, that the Guaranty would be absolute, unconditional, independent, and a guaranty of payment and not collection of the Note.

10.    The Note matured on July 28, 2007 and was not repaid.

11.    As of October 25, 2007, there is due and owing under the Note principal, interest and expenses in the amount of $10,115,146.88, including attorneys fees, costs, late fees and other charges.  Interest continues to accrue under the Note.

**COUNT I**
**Breach of Guaranty**
**Ganesan Visvabharathy**

12.    Plaintiff restates and reincorporates by reference Paragraphs 1 through 11 of this Complaint as Paragraph 12 herein.

13.    The Guaranty constitutes a valid, binding and existing contract between IBA and Visvabharathy.

14.    Visvabharathy has breached the Guaranty by failing to pay all amounts owed IBA.

15.    As a proximate result of Visvabharathy's breach of the Guaranty, IBA has been monetarily damaged.

16.    IBA has fully complied with any and all obligations it had to Visvabharathy pursuant to the Guaranty.

17.    As of October 25, 2007, there exits a balance owed to IBA under the Note in the amount of $10,115,146.88, with per diem interest thereafter, plus interest, attorneys' fees and costs.

WHEREFORE, Plaintiff, IBA, LLC, respectfully requests that this Court enter judgment in its favor, and against Ganesan Visvabharathy in the amount of $10,115,146.88, with per diem interest thereafter, plus interest, attorneys' fees and costs, as provided under the Guaranty.

3

Dated: November 2, 2007                    IBA, LLC

By: _____
                                           One of Its Attorneys

Gary I. Blackman (ARDC # 6187914)
James G. Martignon (ARDC #6277974)
LEVENFELD PEARLSTEIN, LLC
2 N. LaSalle St., Ste 1300
Chicago, Illinois 60602
Telephone: (312) 346-8380
Facsimile: (312) 346-8434

PLAINTIFF'S
EXHIBIT

tabbies

07-28-2005

Loan No. 52-8600000

### PROMISSORY NOTE
### (Monthly Interest)
### (Mezzanine Loan)

$9,500,000.00

Jacksonville, Florida

July 28, 2005

THIS NOTE PROVIDES FOR INTEREST AT A FLUCTUATING RATE PER ANNUM BASED ON THE PRIME RATE (PLUS ANY APPLICABLE SPREAD OVER THE PRIME RATE INDICATED BELOW) `BASED ON THE TERMS AND CONDITIONS SET FORTH BELOW.

This Second Promissory Note is executed pursuant to the Building Loan Agreement dated as of the date of this Note between BLUFF HOUSE, LLC, an Illinois limited liability company, and ANASTASIA SHORES, LLC, an Illinois limited liability company (individually and collectively, the "Borrower" ) and IBA, LLC, a Delaware limited liability company (the "Lender") (such Building Loan Agreement, as it may from time to time be supplemented, modified and amended, being referred to in this Note as the "Agreement"), the terms and conditions of which are hereby incorporated by reference. Capitalized terms not otherwise defined in this Note shall have the meaning ascribed thereto in the Agreement.

1.    FOR VALUE RECEIVED, the Borrower promises to pay to the Lender, or order, at the Lender's office located at 3465 East Foothill Boulevard, 1st Floor, Pasadena, California 91107, Attention:  Homebuilder Division (or such other location specified by the Lender from time to time in writing), the principal amount of Nine Million Five Hundred Thousand and 00/100 Dollars ($9,500,000.00), or so much of such amount as may be advanced by or on behalf of the Lender from time to time, together with interest as provided in § 3 below.

2.    If not sooner paid, the principal of this Note shall be payable on July 28, 2007 (the "Maturity Date").  Accrued interest shall be payable on the first day of each calendar month, on the Maturity Date and on the date of final payment of the principal of this Note in full, except that any interest which accrues after the Maturity Date or the acceleration of the maturity of this Note shall be payable immediately and without demand.

3.    (a)    The unpaid principal of this Note outstanding from time to time shall bear interest at a fluctuating rate per annum (computed on the basis of a year of 360 days and actual days elapsed) equal at all times to the Prime Rate plus Three percent (3.00%) per annum, with each change in such rate taking effect simultaneously with the corresponding change in the Prime Rate (such fluctuating rate of interest being referred to in this Note as the "Base Rate").  Notwithstanding the preceding, in no event shall the Base Rate be less than Ten percent (10.00%) per annum.

(b)    Accrued interest not paid when due shall, from and after the date when due until the date such interest is paid, bear interest at the Alternate Rate.  The Alternate Rate shall

also apply to any judgment obtained with respect to this Note and/or the Loan Documents until the amount of such judgment is paid in full.

(c)    Accrued interest not paid to Lender on or before the twentieth (20th) calendar day of each month in which it becomes due, Borrower shall pay, at Lender's option, a late or collection charge equal to five percent (5.00%) of the amount of such unpaid interest payment.  Borrower agrees that this late or collection charge represents a reasonable sum considering all of the circumstances existing on the date of execution of this Note and represents a fair and reasonable estimate of the costs that Lender will incur by reason of late payment. Borrower further agrees that proof of actual damages would be costly and inconvenient. Acceptance by Lender of payment of the late or collection charge payable pursuant to this Section 3(c) will not constitute a waiver of the Event of Default which occurred by reason of the failure of Borrower to make timely payment and will not prevent Lender from exercising any other rights or remedies available to Lender by reason of such Event of Default.

(c)    Notwithstanding § 3(a), any principal of this Note not paid when due (whether at the stated maturity, by acceleration or otherwise) shall, from and after the date when due until the date such principal is paid, bear interest at the Alternate Rate.

(d)    As used in this Note:

"Alternate Rate" means a fluctuating rate per annum (computed on the basis of a year of 360 days) equal at all times to the Base Rate plus 10.00% per annum, with each change in such rate taking effect simultaneously with the corresponding change in the Base Rate.

"Prime Rate" means the rate as published in the "Money Rates" section of The Wall Street Journal with changes thereon to be effective as of the date of such change.  The foregoing notwithstanding, if The Wall Street Journal ceases to publish the "Money Rates" section or if there is a suspension of publication of The Wall Street Journal, then an alternative source for determining the Prime Rate shall be selected by Lender in its sole discretion.

4.    This Note may be prepaid in whole or in part at any time without penalty.  All payments on this Note shall be made in lawful money of the United States in same day funds. All advances and payments of principal of this Note may be endorsed by the Lender on the attached schedule.

5.    This Note is the "Note" referred to in, and is entitled to the rights and benefits of, the Agreement, and evidences advances of the proceeds of the loan made by or on behalf of the Lender to the Borrower under the Agreement.  Among other things, the Agreement provides for acceleration of the maturity of this Note upon the happening of certain stated events and may also contain additional provisions regarding voluntary and mandatory prepayments under certain conditions.  This Note is secured by the trust deed executed by the Borrower in favor of the

Lender pursuant to the Agreement and by any other collateral agreements referred to in the Agreement which purport to secure this Note.

      6.    This Note shall be governed by, and construed and enforced in accordance with, the laws of Florida.

      7.    Neither this Note nor any of the other Loan Documents shall be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum interest rate permitted to be charged under applicable law. If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any other Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the unpaid principal balance of this Note. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all indebtedness that constitutes interest, as well as all other charges made in connection with the indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note.

**[THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS]**

27341

8. Time is of the essence of each and every provision of this Note.

"BORROWER":

BLUFF HOUSE, LLC, an
Illinois limited liability company

By: _____
Ganesan Visvabharathy, Manager

ANASTASIA SHORES, LLC, an
Illinois limited liability company

By: _____
Ganesan Visvabharathy, Manager

**Florida Documentary Stamp Tax in the amount of $ _____ computed on the face amount of this Note has been paid and the Mortgages and Security Agreements securing this Note recorded in Clay and St. John Counties, Florida have been so noted.**

PLAINTIFF'S
EXHIBIT

2

07-28-2005

Loan No. 52-8600000

LOAN AGREEMENT

(Second Mortgage Loan)

Dated as of July 28, 2005

BLUFF HOUSE, LLC, an Illinois limited liability company and ANASTASIA SHORES, LLC, an Illinois limited liability company (individually and collectively, the "Borrower"), and IBA, LLC, a Delaware limited liability company (the "Lender"), agree as follows:

1.00   Preliminary Statement.   The Borrower owns or is about to acquire the Land described in Exhibit "A", which consists (A) 41 multi-unit Buildings located in St. Augustine Beach, St. John County, Florida (the "Anastasia Property"), and (B) 30 multi-unit Buildings located in Orange Park, Clay County, Florida (the "Bluff Property"), and intends to construct 164 residential condominium Units and other Improvements on the Anastasia Property and 292 residential condominium Units and other Improvements on the Bluff Property in accordance with the Improvement Plans submitted by the Borrower to the Lender. In order to finance a portion of the cost of the Land and the payment of certain costs and expenses relating to the Project, the Borrower has applied to the Lender for a Loan in the amount of $9,500,000.00, the repayment of which will be secured by a second trust deed lien on the Borrower's interest in the Land and the Improvements and the other Collateral covered by the Mortgage to be executed by the Borrower in favor of the Lender pursuant to this Agreement. The Lender is willing to make the Loan to the Borrower on the terms and conditions set forth in this Agreement.

Capitalized terms used in this Agreement and not otherwise defined are used with the meanings set forth in Exhibit "E".

2.00   Documentation.   Prior to the Disbursement of the proceeds of the Loan, the Borrower shall deliver or cause to be delivered to the Lender, in form and substance satisfactory to the Lender, the Loan Documents and other "Required Items" specified in Exhibit "C", together with such other Documents and information relating to any Loan Party, the Collateral, the Project or the transactions contemplated by the Loan Documents as the Lender may reasonably request.

3.00   Disbursement Procedures.   Subject to the terms, conditions and procedures set forth in this Agreement and in the "Disbursement Schedule" attached as Exhibit "B", the Lender shall disburse the proceeds of the Loan to or for the account of the Borrower as provided herein. The aggregate amount of such Disbursement shall not exceed the Loan Amount, and the

2

obligation of the Borrower to repay the amount thereof shall be evidenced by the Note.

4.00    Payment of Principal.    The Borrower shall pay the principal of the Loan, in accordance with the following terms and provisions:

4.01    Principal.    If not sooner paid, the principal of the Loan shall be payable in full on the earlier of the Final Sale Date, the Maturity Date or the Default Date.    Such principal may be voluntarily prepaid by the Borrower in whole or in part at any time without penalty.    Partial prepayment of principal shall be required on the Sale Date with respect to each Permitted Sale in an amount equal to the lesser of the Net Proceeds of such Sale or the principal of the Loan then outstanding.

4.02    Distribution of Sales Proceeds from Sold Units.    Sales proceeds, after payment by Borrower of Closing Costs in connection with each Sale shall be distributed in the following order:

i)    First, to IndyMac Bank, F.S.B. ("IndyMac") and applied to accrued but unpaid interest, fees and costs then due under IndyMac's loan to Borrower in the amount of Forty-Six Million Eight Hundred Fifty Thousand Dollars ($46,850,000.00) (the "Senior Loan");

ii)    Second, to IndyMac, an amount equal to the applicable "Release Price" set forth in Exhibit "E" of that certain Building Loan Agreement dated as of even date herewith by and between Borrower and IndyMac (the "Senior Loan Agreement"), with such amount to be applied by IndyMac to the then outstanding balance of the Senior Loan;

iii)    Third, to Lender and applied to fees and costs then due under this Note;

iv)    Fourth, to Lender and applied to accrued interest until the accrued interest has been fully repaid;

v)    Fifth, to Lender, and applied to the principal amount outstanding under this Note, until paid in full; and

vi)    Sixth, to Lender, the balance thereof to be applied to the Release Fee, until paid in full.

5.00    Covenants of the Borrower.    Unless the Lender otherwise consents in writing:

5.01    Construction of Improvements.    The Borrower shall cause construction of the Improvements to commence within seven (7) months after the date the Mortgage is recorded, and shall be diligently and continuously prosecuted to completion, subject in each case to the following requirements:    (a) the Improvements shall be constructed in substantial conformity with the Improvement Plans and in compliance in all material respects with all applicable Laws and Other Requirements, and in a good and workmanlike manner with new materials of good quality;

2

3

(b) except as otherwise contemplated by the Improvement Plans with respect to any "Site Development" work, the Improvements shall be constructed entirely on the Land and shall not encroach upon or overhang any lot line, boundary, set-back, easement, right-of-way or other land; (c) the "plan number" for each Unit shall be constructed on the lot or at the location specified in Exhibit "D"; (d) construction of the Improvements shall in any event be completed on or before the Maturity Date; and (e) the Borrower hereby covenants and agrees, on behalf of itself and any of its Affiliates, that no such Person shall construct, create, arrange, develop, purchase or sell any residential housing improvements (or units which are components thereof) which constitute a Competing Project.

If at any time the Lender notifies the Borrower that construction of the Improvements does not conform to the requirements of this § 5.01 or any such nonconformity is otherwise discovered by the Borrower, the Borrower shall immediately cause such nonconforming construction to be stopped and all necessary corrective work to be commenced and diligently and continuously prosecuted to completion.

5.02   Change Orders.   The Borrower shall not permit any Change Order to the Improvement Plans to be implemented without the prior approval of the Lender, provided that this § 5.02 shall not prevent routine changes in construction which would not cause the Improvements to fail to be in substantial conformity with the approved Improvement Plans and which are not otherwise material in the aggregate.

5.03   Compliance with Laws and Other Requirements.   The Borrower shall (a) designate the Lender as "construction lender" in all applications for building permits, the Notice of Commencement under Section 713.13, Florida Statutes and in the Construction Contract, if any, and provide the Lender's name and address to all Lien Claimants who have given preliminary 20-day notice, in each case as required by Section 713.06(2), Florida Statutes, unless served upon Lender, (b) comply in all material respects with all other applicable Laws and Other Requirements relating to the Collateral or the Project, and (c) obtain and maintain all Authorizations required in connection with the Collateral or the Project.

5.04   Project Agreements.   The Borrower shall (a) take all action reasonably necessary or appropriate to maintain and enforce its rights and interests under each of the Project Agreements (including the Architect Agreement, the Construction Contract, if any, and any Financing Commitment), (b) comply in all material respects with its obligations under each of the Project Agreements, (c) not permit or agree to any supplement, modification, amendment or termination of, or consent or agree to any waiver of or departure from the terms of, any of the Project Agreements, and (d) not transfer, encumber or release any interest in, or commit or permit any material breach or default on the part of the Borrower under, any of the Project Agreements, except that so long as no Event of Default has occurred and is continuing, this § 5.04 shall not apply (i) with respect to any Project Agreements other than any required Financing Commitment, to any failure of the Borrower to comply with such requirements which in the aggregate does not, and in the reasonable judgment of the Borrower and the Lender will not, materially impair the Borrower's ability to perform its Obligations under the Loan Documents, (ii) to any amendment of the Architect Agreement or the Construction Contract, if any, to incorporate any Change Orders

4

which are permitted to be implemented by § 5.02, or (iii) to the termination of any Project Agreement as a result of a material breach or default by the other party.

5.05    Collateral. The Borrower shall take all action necessary or appropriate from time to time to maintain the Mortgage as an indefeasible second priority (or, after reconveyance of the First Mortgage, first priority) perfected Lien in the Collateral (subject only to the First Mortgage and other Permitted Prior Exceptions), and shall not at any time part with possession of or abandon any of the Collateral or cause or permit any interest in any of the Collateral to be sold, transferred, leased, encumbered, released, relinquished or otherwise disposed of (whether voluntarily, by operation of law or otherwise), provided that:  (a) so long as no Event of Default has occurred and is continuing, and subject to receipt by the Lender of the Net Proceeds (for application as provided in §§ 4.01 and 4.02) and payment of all applicable costs, fees and expenses, (i) the Borrower may sell Units (together with undivided interests in common areas to be transferred to purchasers of such Units) in the ordinary course of business in connection with Permitted Sales and may transfer common areas to a homeowners association if and when required by applicable Laws or Other Requirements, and (ii) the Lender shall release Units and common areas or interests in common areas so sold or transferred from the Lien of the Mortgage; and (b) the requirements of this sentence shall not prohibit (1) the creation or existence of any Permitted Exceptions or other Permitted Transfers, or (2) any action with respect to any Project Agreements to the extent permitted by § 5.04.  Except for the release of any Collateral as set forth above, the Lender shall not be obligated to release any Collateral until payment in full of all Obligations of the Borrower, including all interest and fees, and termination of all further obligations of the Lender under the Loan Documents.

The Borrower shall at all times use its best efforts to market and sell Units in compliance with the terms of this Agreement.

5.06    Personal Property. The Borrower shall not (a) install or otherwise use or acquire for use in connection with the Collateral or the Project any Personal Property (including replacement Personal Property pursuant to clause (iii) below) which is not owned by the Borrower free and clear of all Liens (including conditional sale contracts) and Rights of Others (other than Permitted Exceptions) or which is not a part of the Collateral, or (b) cause or permit the removal from the Land (or, in the case of offsite improvements, from the location of installation) of any Personal Property which is installed or otherwise used or acquired for use in connection with the Collateral or the Project, except that so long as no Event of Default has occurred and is continuing, this clause (b) shall not prohibit (i) the temporary removal of Personal Property for repairs in the ordinary course of business, (ii) the removal of Personal Property of insignificant value which is not reasonably necessary or appropriate to the completion of the Project, or (iii) the removal of defective or worn out Personal Property which has been replaced by other Personal Property of equal or greater suitability and value which is intended for the same purpose.  Upon removal of any Personal Property in compliance with clauses (ii) and (iii) above, the Borrower shall be permitted to transfer or otherwise dispose of such Personal Property as the Borrower may determine.

4

5

5.07    Liens, Taxes and Project Costs. The Borrower shall (a) pay, prior to delinquency, all Taxes which are or may become a Lien affecting any of the Collateral, and not consent to any Special Taxes which affect or may affect any of the Collateral, (b) keep the Collateral free and clear of all Liens and Rights of Others, subject only to Permitted Exceptions and Permitted Transfers, (c) promptly pay or cause to be paid, and obtain valid and enforceable lien releases or waivers (together with invoices or receipts identifying the nature of each payment) from, all Lien Claimants, and otherwise pay when due all Project Costs incurred in connection with the Project, (d) to the extent permitted by applicable Laws, diligently file or procure the filing of valid notices of completion upon completion of construction of any Improvements and a notice of cessation of labor upon cessation of construction for a continuous period of 30 days or more, and take all other steps necessary to forestall the assertion of Lien Claims, and (e) pay and perform when due all other obligations secured by or constituting a Lien affecting any of the Collateral, except that the Borrower shall not be required to pay or perform any such Taxes, Lien Claims or other obligations which are being actively contested in good faith by appropriate proceedings, provided that the Borrower has posted such security for the payment or performance of such Taxes, Lien Claims or other obligations as the Lender may reasonably require and, by reason of nonpayment, none of the Collateral or any Lien or other interest of the Lender under the Loan Documents is prejudiced or in danger of being sold, foreclosed or otherwise lost or forfeited.

In the event that a stop notice is asserted against the Lender or any action or other proceeding is instituted to enforce any Lien (including any mechanics lien, and whether or not such Lien constitutes a Permitted Exception) against any of the Collateral, the Borrower shall immediately make such payments, obtain such surety bonds and/or take such other action as the Lender may reasonably require in order to release the stop notice or Lien. Upon failure of the Borrower to release any such stop notice, the Lender may, at its option, file an interpleader action to resolve any pending claims.

The Borrower irrevocably appoints the Lender as its agent (such agency being coupled with an  interest) to file any notices (including notices of completion and cessation of labor) that the Lender deems appropriate in order to protect its interests under the Loan Documents.

5.08    Property and Liability Insurance. The Borrower shall at all times maintain the following policies of insurance:

(a)    with respect to any Improvements as to which construction has commenced but has not been completed and any Personal Property used or to be used in connection with such Improvements, builder's "all risk" insurance ("completed value" form), including "course of construction" coverage;

(b)    with respect to any Improvements as to which construction has been completed and any other improvements now or in the future located on the Land (other than "Model Units" shown on Exhibit "D") and any Personal Property used or to be used in connection with such Improvements, property "all risk" insurance;

(c)    with respect to any "Model Units" shown on Exhibit "D" as to which

5

6

construction has been completed and any Personal Property used or to be used in connection with such "Model Units," fire and extended coverage insurance (including coverage for vandalism and malicious mischief);

(d) commercial general liability insurance in favor of the Borrower (and naming the Lender and its Affiliates as additional insureds) in an aggregate amount not less than $2,000,000 (or such greater amount as may be specified by the Lender from time to time) combined single limit; and

(e) such other insurance as may be required by applicable Laws (including worker's compensation and employer's liability insurance) or as the Lender may reasonably require from time to time (including comprehensive form boiler and machinery insurance, if applicable).

The Borrower shall also cause the Contractor, if any, and each subcontractor to maintain a policy of commercial general liability insurance and, upon request by the Lender, shall cause the Architect and any engineer engaged in connection with the Project to maintain a policy of professional liability insurance, in each case for such periods and in such amounts as the Lender may reasonably require from time to time.

Each policy of property insurance required by this § 5.08 shall be in an amount not less than the full replacement cost of the property covered by such policy, shall contain a "full replacement cost" indorsement, shall insure against flood loss risk if the Land is located in a Flood Hazard Area, and shall name the Lender and its Affiliates as "loss payee" pursuant to form BFU 438 or other form approved by the Lender. Each policy of commercial general liability insurance required by this § 5.08 shall cover personal injury, property damage, owner/contractor protective, blanket contractual liability and (where applicable) completed operations, with x, c and u exclusions deleted, and such insurance shall be primary and non-contributing with any other insurance available to the Lender. All insurance policies shall be in form and substance and issued by insurers reasonably satisfactory to the Lender, and shall contain such deductibles and such indorsements as the Lender may reasonably require. Upon request by the Lender from time to time, the Borrower shall deliver to the Lender originals or copies of all such insurance policies and certificates evidencing such policies.

5.09    Title Insurance and Searches.  The Borrower shall deliver to the Lender, in form and substance satisfactory to the Lender, such indorsements to the Title Policy and such preliminary title reports and other title or lien searches (including UCC searches) and tax service contracts as the Lender may reasonably require from time to time.

5.10    Books, Records and Inspections.  The Borrower shall at all times maintain (a) full and complete books of account and other records with respect to the Collateral and the Project and its business and operations, (b) complete copies of the Improvement Plans, all Project Agreements and all Authorizations issued in connection with the Collateral or the Project, and (c) a complete file of all invoices, receipts and lien releases and waivers obtained by the Borrower

7

with respect to amounts paid for Project Costs, and (d) the Condominium Declaration, and shall permit the Lender and its agents, upon request from time to time, to inspect and copy any of such books, records and other Documents and to enter and inspect the Real Property and any other Collateral and all work and materials furnished in connection with the Project.

5.11 <u>Construction Information and Reporting Requirements</u>. The Borrower shall cause to be delivered to the Lender, in form and detail satisfactory to the Lender:

(a) promptly after discovery by the Borrower, notice of (i) any fact or circumstance that may or will cause estimated Project Costs for any aspect of the Project to increase or decrease by more than 5% or by more than $50,000, (ii) any failure of the Project or the Improvements to be in substantial conformity with the Improvement Plans and in compliance in all material respects with all applicable Laws and Other Requirements, (iii) any actual or anticipated material delays in construction, (iv) any serious threat or the commencement of any action or other proceeding (including any action to foreclose or otherwise enforce any Lien Claim or other Lien and any proceedings in condemnation or eminent domain) affecting or relating to any of the Collateral or the Project, (v) the occurrence or allegation of any termination, material breach or default, or failure of any material condition or other requirement under the Architect Agreement, the Construction Contract, if any, or any Financing Commitment, (vi) any dispute between the Borrower and any Governmental Agency relating to any of the Collateral or the Project, the adverse determination of which could adversely affect the Collateral or the Project in any material respect, (vii) any injury or damage to or loss or destruction of any of the Collateral if the cost of repair, restoration or replacement exceeds $25,000, (viii) any imposition of or proposal for any Special Taxes which affect or may affect any of the Collateral, (ix) any material adverse change in the financial condition, operations, properties or prospects of any Loan Party, (x) any event which has or may have a material adverse impact on the Collateral or the Project, and (xi) the occurrence of any Event of Default or event which, with the giving of notice and/or the passage of time, could become an Event of Default;

(b) promptly after receipt by the Borrower, copies of all notices or other communications delivered to the Borrower or the Real Property which are addressed to the Lender or to "construction lender";

(c) on or before the 15th day of each month, a report on a form approved by the Lender describing sales activities for the Project as of the end of the prior month;

(d) after the end of each fiscal year for each Loan Party, Financial Statements for such Loan Party for and as at the end of such fiscal year, and upon request by the Lender from time to time, quarterly Financial Statements and Tax Returns for each Loan Party and copies of any audited Financial Statements prepared for any Loan Party, in each case certified in a manner acceptable to the Lender as more fully defined in Exhibit "C" of this Agreement; and

(e) from time to time upon request by the Lender, a report describing the status

8

of the Project, together with a summary of amounts paid for Project Costs and a budget setting forth the Borrower's best estimate of the Project Costs necessary to complete the Project, and such other information with respect to the Project as the Lender may require; and

(f)    such other Documents or information relating to any Loan Party, the Collateral, the Project or the transactions contemplated by the Loan Documents as the Lender may reasonably request from time to time.

The Lender is authorized at any time and from time to time to directly contact the Contractor, if any, or any subcontractor or other Lien Claimant or potential Lien Claimant or other Person to verify any information provided by the Borrower or for any other purpose.

5.12    Costs, Fees and Expenses.  The Borrower shall bear sole responsibility for and promptly pay or cause to be paid all costs and expenses relating to the performance by the Borrower of its Obligations or the delivery to the Lender of any Documents or other items or information under or in connection with any of the Loan Documents, and any Taxes (other than income taxes of the  Lender), costs, expenses, fees or charges payable or determined to be payable in connection with the execution, delivery, filing or recording of, or otherwise with respect to, any Loan Document or any other Document delivered under or in connection with any Loan Document.

The Borrower shall pay the Loan Fee to the Lender at or prior to the time of recordation of the Mortgage, and shall pay to the Lender on demand all costs, expenses and charges of the Lender in connection with the approval of the Loan by the Lender and the negotiation, preparation, execution, delivery, administration, supplement, modification, amendment, waiver and enforcement of, and any other action taken by the Lender under or otherwise to protect its rights and interests in respect of, any Loan Document, and any litigation, dispute, action or other proceeding (including bankruptcy proceedings) relating thereto, including recording fees, filing fees, search fees, reconveyance fees, title insurance premiums, appraisal, engineering, inspection and consulting fees, the reasonable fees and disbursements of the Lender's legal counsel and other out-of-pocket expenses, the reasonable charges of the Lender's internal legal counsel, and any fees or other charges of the Lender for appraisals or inspections or for review of appraisals, budgets, plans and specifications or other matters relating to the Project or the Collateral.

Any amount payable to the Lender under any of the Loan Documents (including any amount payable under this § 5.12) which is not paid on the date when due shall, from and after such date, bear interest at the Alternate Rate until paid.  Such interest shall be payable by the Borrower to the Lender immediately and without demand.

5.13    Indemnification by the Borrower.  The Borrower shall indemnify, defend and save and hold harmless the Lender and its Affiliates, and the respective directors, officers, agents, attorneys and employees of each (collectively the "Indemnitees") from and against, and shall pay on demand, any and all losses, liabilities, damages, costs, expenses and charges (including the

9

reasonable fees, charges and disbursements of internal and external legal counsel) suffered or incurred by any Indemnitee as a result of (a) any failure of the Borrower to perform any of its Obligations under any Loan Document, (b) any failure of any Representation by the Borrower to be correct in all respects when made, (c) injury or death to persons or damage to property or other loss occurring on or in connection with the Collateral or the Project, whether caused by the negligence or any other act or omission of the Borrower or any Lien Claimant or any other Person or by negligent, faulty, inadequate or defective design, building, construction or maintenance or any other condition or otherwise, (d) any claim of any surety in connection with any bond relating to construction of any Improvements or offsite improvements, (e) any claim by any Person that the Lender is in any way responsible or liable for any act, omission or obligation of the Borrower or any Lien Claimant, and (f) any claim, demand or cause of action, or any action or other proceeding, whether meritorious or not, brought or asserted against any Indemnitee which relates to or arises out of the Loan Documents, the Loan, the Collateral, the Project or any transaction contemplated by, or the relationship between the Borrower and the Lender or any action or inaction by the Lender under, the Loan Documents, provided that no Indemnitee shall be entitled to indemnification under this § 5.13 for matters caused solely by such Indemnitee's gross negligence or willful misconduct. Any obligation of the Borrower under this § 5.13 shall survive the making and repayment of the Loan and the expiration or termination of this Agreement and shall be secured by the Mortgage.

   5.14    Additional Covenants.  The Borrower shall perform each of the obligations (if any) set forth in Exhibit "C", in the manner and within the time limits set forth therein.

   5.15    Actions and Further Assurances.  The Borrower shall appear in and defend all actions and other proceedings purporting to affect any of the Collateral or the Project or the rights or interests of the Lender under the Loan Documents (and the Lender may, at the Borrower's expense, appear in and defend any such action or other proceeding as the Lender may determine), and the Borrower shall take or cause to be taken such further action and execute and deliver or cause to be executed and delivered such further Documents as the Lender from time to time may reasonably require to maintain, perfect, protect, assure and confirm the Lender's rights and interests (including rights and interests in the Collateral), the Borrower's Obligations and the intention of the parties under the Loan Documents.

   5.16    Performance by the Lender.  If the Borrower fails to perform any of its Obligations under any Loan Document and the Lender reasonably determines that remedial action is necessary to protect the rights or interests of the Lender, the Lender may, without notice to or demand on the Borrower, perform any such Obligations in such manner and to such extent and take such other action as the Lender may deem appropriate, and all costs, expenses and charges of the Lender relating to any such action shall be payable by the Borrower to the Lender in accordance with § 5.12.

   5.17    Sales of Units.  The Borrower shall not enter into any contract to sell or transfer a Unit other than an Acceptable Sale Contract.  Not later than the time any Unit is Closed, the Borrower shall pay or cause to be paid to Lender the Release Price.  The Release Price will be applied against indebtedness due under the Note, under this Agreement and under the Loan

10

Documents, and may be allocated to principal, interest, or other charges or indebtedness, if any then due, thereunder as Lender in its sole discretion may determine.

Each and every time during the term of the Loan that Borrower enters into a contract to sell or transfer a Unit, Borrower agrees that, (a) such contract shall be deemed collaterally assigned pursuant to the Assignment of Project Documents described on Exhibit C attached hereto; and (b) simultaneously upon executing such contract, Borrower shall execute and deliver to Lender such additional documents required by Lender to evidence such collateral assignment all of Borrower's rights under said contract to Lender. Each such additional document shall be on a form approved by Lender in its sole discretion.

    5.18    Payoff/Release.    In the event the Loan is paid in full within 12 months after the recording of the Mortgage, Borrower shall pay an additional payoff/release fee in the amount of $379,392.00 .In the event the Loan is paid in full after 12 months but within 15 months after the recording of the Mortgage, Borrower shall pay an additional payoff/release fee in the amount of $478,800.00. In the event the Loan is paid in full after 15 months but within 18 months after the recording of the Mortgage, Borrower shall pay an additional payoff/release fee in the amount of $547,200.00. In the event the Loan is paid in full after 18 months but within 21 months after the recording of the Mortgage, Borrower shall pay an additional payoff/release fee in the amount of $615,600.00. In the event the Loan is paid in full after 21 months but within 24 months after the recording of the Mortgage, Borrower shall pay an additional payoff/release fee in the amount of $684,000.00.

    6.00    Representations of the Borrower.    The Borrower represents and warrants to the Lender that:

    6.01    Formation and Qualification.    Each Loan Party which is a corporation is duly incorporated, validly existing and in good standing under the Laws of the jurisdiction of its incorporation and is duly qualified in Florida; each Loan Party which is a limited liability company, partnership, trust or other entity is duly formed and validly existing under the Laws of the jurisdiction of its formation and, in the case of a limited partnership formed under the Laws of a jurisdiction other than Florida, is duly registered in Florida; each Loan Party which is a corporation, limited liability company or limited partnership is in good standing in Florida; and each Loan Party has all requisite power and authority to conduct its business and to own and lease its properties.

    6.02    Loan Documents.    The execution, delivery and performance of the Loan Documents by each Loan Party are within such Loan Party's power and authority, have been duly authorized by all necessary action and do not and will not (a) require any Authorization which has not been obtained (except to the extent indicated in § 6.05(b) with respect to Authorizations required in connection with the Collateral or the Project), (b) contravene the Charter Documents of any Loan Party, any applicable Laws or Other Requirements or any agreement or restriction binding on or affecting any Loan Party or its property, or (c) result in or require the creation or imposition of any Lien or Right of Others upon or with respect to any property now or in the future owned by any Loan Party (other than Liens in favor of the Lender). No Authorization which has

11

not been obtained is required for the creation of the Liens or the enforcement by the Lender of its Remedies under the Loan Documents. Each Loan Document, when executed and delivered, will constitute the legal, valid and binding obligations of each Loan Party which is a party to or bound by such Loan Document, enforceable against such party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or other similar Laws affecting the rights of creditors generally.

6.03    Finder's or Broker's Fees.    Except as otherwise disclosed in Part B of Exhibit "C": (a) no finder's, broker's or other fee or compensation of any kind is payable to any Person in connection with the Loan, and (b) the payment of any such fee disclosed in Part B of Exhibit "C" is the sole responsibility of the Borrower and such fee has been (or upon recordation of the Mortgage will be) paid in full by the Borrower. The Borrower hereby indemnifies and holds harmless the Lender from any claims, liability, damages, costs or expenses (including without limitation the fees and expenses of legal counsel) resulting from or arising out of any claims or assertions by any Person (including without limitation any broker, agent, financial advisor or other intermediary) for any finder's, broker's or other fee or compensation of any kind in connection with the Loan. Such indemnification obligation on the part of the Borrower shall survive termination of the Loan Documents.

6.04    Collateral.    The Borrower has and will continue to have (or upon recordation of the Mortgage will have and from and after such recordation will continue to have) good and marketable title to the Collateral, free and clear of all Liens and Rights of Others, subject only to the First Mortgage and other Permitted Exceptions and Permitted Transfers. Upon recordation of the Mortgage and filing of the financing statement executed by the Borrower, the Mortgage will create a valid and indefeasible second priority perfected Lien in the Collateral securing the payment and performance of all Obligations, subject only to the First Mortgage and other Permitted Prior Exceptions and Permitted Transfers. No financing statements covering any of the Collateral are on file in any public office, except financing statements in favor of the Lender and any other financing statements approved by the Lender in writing.

6.05    Project Information.    (a) The Borrower and, to the best knowledge of the Borrower, any Governmental Agency having jurisdiction over the Land have complied in all material respects with all applicable Laws and Other Requirements relating to the division and development of the Real Property, and the Borrower is, and the construction of the Improvements in accordance with the terms of this Agreement will be, in compliance in all material respects with all applicable Laws and Other Requirements relating to the Collateral or the Project.    (b) Except as otherwise disclosed in Part B of Exhibit "C", (i) all Authorizations required in connection with the Collateral or the Project have been regularly and finally received (other than routine building permits for work which has not yet commenced and any required certificates of occupancy or other approvals of construction by any Governmental Agency which (in each case) are to be issued on a ministerial basis as required from time to time during the course of construction and after completion), and (ii) the development and use of the Real Property for its intended purpose do not require the payment of extraordinary fees or assessments or the construction of other improvements, will not contravene any applicable Laws or Other Requirements, and are not subject to any other legal, contractual or practical impediments which are material in the aggregate. (c) The "Project Budget"

11

12

delivered by the Borrower to the Lender is based on information deemed reliable by the Borrower and represents the Borrower's best estimate of all Project Costs that will be required in connection with the Project. (d) All Utility Services, streets, walks and other offsite improvements relating to or adjoining the Land or necessary for the development of the Project and the occupancy of the Real Property for its intended purpose have been or will be promptly completed and/or otherwise made available and are not and will not be subject to any conditions or restrictions which may adversely affect the Collateral or the Project in any material respect. (e) The approximate acreage of the Land is correctly set forth in § 1.00 and, except as otherwise disclosed in Part B of Exhibit "C", (i) the Land is not located in a Flood Hazard Area, nor is the Land subject to or affected by any existing or proposed Special Taxes (other than Special Taxes approved in writing by the Lender after the date of this Agreement), and (ii) each Unit (together with any undivided interests in common areas to be transferred to the purchaser of such Unit) and any common areas to be transferred to a homeowners association are separately transferable in compliance with all applicable subdivision Laws and Other Requirements. (f) Except as otherwise disclosed in writing to the Lender, the Architect Agreement and the Construction Contract, if any, are in full force and effect and free from any material breach or default by any party. (g) The Declarations are, or upon completion and recording thereof will be, in full force and effect and (i) the assignment of the Declarations to the Borrower and the collateral assignment thereof to the Lender have been, or will be, consented to by all necessary parties, (ii) Borrower is not in default under any of the Declarations, has satisfied, or will satisfy, all of its obligations under the Declarations required to be performed as of the date hereof, and does not anticipate any impediments to the satisfaction of any of its obligations under the Declarations required to be performed after the date hereof, (iii) the condominium association contemplated under the Declarations will, prior to the Closing of the first sale of a Unit, be validly formed, and (v) Borrower shall not finalize or record the Declarations without the prior written consent of Lender.

6.06    _Financial Information_.  (a) The Financial Statements of each Loan Party which have been furnished to the Lender fairly present such Loan Party's financial condition as at the dates of such Financial Statements and the results of operations for the periods covered by such Financial Statements in accordance with generally accepted accounting principles consistently applied (or such other method of preparation approved by the Lender in writing), and since the respective dates of such Financial Statements, there has been no material adverse change in the financial condition, operations, properties or prospects of such Loan Parties. (b) Each Loan Party has filed all tax returns required to be filed by it, and has paid all Taxes due pursuant to such returns or in respect of any of its properties (except for any such Taxes which are being actively contested in good faith by appropriate proceedings), and to the best knowledge of each Loan Party, no basis exists for additional assessments which have not been adequately reserved against in the Financial Statements referred to above or otherwise disclosed in writing to the Lender.

6.07    _Litigation and Other Matters_.  Except as otherwise disclosed in writing to the Lender: (a) no actions or other proceedings affecting or relating to the Collateral or the Project are pending or, to the best knowledge of each Loan Party, threatened, (b) no actions or other proceedings are pending or, to the best knowledge of each Loan Party, threatened against or affecting any Loan Party or any property of any Loan Party which, if determined adversely to such

12

13

Loan Party, could materially impair the financial condition, operations, properties or prospects of such Loan Party or the ability of such Loan Party to perform its obligations under the Loan Documents, and (c) the Borrower has given notice to the Lender of any other matters which the Borrower is required to disclose to the Lender under § 5.11(a).

6.08    Documents and Other Information.  All Documents and other information delivered to the Lender pursuant to any of the Loan Documents are and will be complete and correct in all material respects at the time of delivery to the Lender.

6.09    Competing Projects.  Neither the Borrower nor any of its Affiliates has or intends to construct, create, arrange, develop, purchase or sell any residential housing improvements (or units which are components thereof) which constitute a Competing Project.

7.00    Events of Default and Remedies of the Lender.

7.01    Events of Default.  The occurrence of any one or more of the following events shall constitute an  Event of Default:

(a)    the Borrower shall fail to pay all or any portion of the principal of the Note when due; or

(b)    the Borrower shall fail to pay any installment or amount of  interest or any other amount payable by the Borrower to the Lender under the Loan Documents (including any payment or prepayment required by § 4.02) within 20 days after the date when due, or the Borrower shall fail to pay all accrued interest and all other amounts then payable by the Borrower to the Lender under the Loan Documents on the Maturity Date or the date of final payment of the principal of the Note in full; or

(c)    any Loan Party shall fail to perform or observe any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed and either (i) such failure shall continue for more than 30 days after notice of such failure is given by the Lender to such Loan Party, unless such failure is not reasonably capable of being cured within such 30-day period (but is reasonably capable of being cured within 60 days after such notice) and such Loan Party commences action to cure such failure within such 30-day period and diligently and continuously prosecutes such action to completion and causes such failure to be cured within 60 days after such notice, or (ii) such failure is not reasonably capable of being cured within 60 days after notice of such failure is given by the Lender to such Loan Party; or

(d)    any Representation proves to have been incorrect in any material respect when made; or

(e)    work relating to construction of the Improvements ceases for 15 consecutive days for any reason other than acts of God or other causes beyond the reasonable control of the Borrower, or such work ceases for 45 consecutive days for any reason; or

14

(f)    the Borrower is enjoined by any court or other Governmental Agency from constructing the Improvements or selling Units or performing any Obligations and such injunction continues unreleased and unstayed for 45 days; or

(g)    all or a substantial or material portion of the Collateral is damaged or destroyed by fire or other casualty and the Lender has reasonably determined that the security of the Mortgage has been impaired or that the repair, restoration or replacement of the Collateral in accordance with the requirements of the Mortgage is not economically practicable or is not likely to be completed prior to the Maturity Date; or all or a substantial or material portion of the Collateral is condemned, seized or appropriated by any Governmental Agency or subject to any action or other proceeding instituted by any Governmental Agency for any such purpose; or

(h)    any Loan Party is dissolved or liquidated or merged with or into any other Person; or for any period of more than 10 days any Loan Party which is a corporation, partnership, trust or other entity ceases to exist in its present form and (where applicable) in good standing and duly qualified under the Laws of the jurisdiction of its incorporation or formation and Florida; or any Loan Party who is an individual dies or becomes incapacitated; or all or substantially all of the assets of any Loan Party are sold or otherwise transferred; or

(i)    any Loan Party ceases to be managed and controlled by the Person or Persons who manage and control such Loan Party as of the date of this Agreement, or any Loan Party assigns or attempts to assign any rights or interests under any Loan Document without the prior written consent of the Lender; or any Loan Document becomes or is claimed by any Loan Party to be unenforceable against any Loan Party; or the Mortgage shall cease to constitute a valid and indefeasible second priority (or, after reconveyance of the First Mortgage, first priority) perfected Lien in the Collateral, subject only to Permitted Prior Exceptions and Permitted Transfers; or

(j)    any Loan Party is subject to an order for relief by the bankruptcy court, or is unable or admits in writing its inability to pay its debts as they mature or makes an assignment for the benefit of creditors; or any Loan Party applies for or consents to the appointment of any receiver, trustee or similar official for it or for all or any part of its property (or any such appointment is made without its consent and the appointment continues undischarged and unstayed for 60 days); or any Loan Party institutes or consents to any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, custodianship, conservatorship, liquidation, rehabilitation or similar proceeding relating to it or to all or any part of its property under the Laws of any jurisdiction (or any such proceeding is instituted without its consent and continues undismissed and unstayed for 60 days); or any judgment, writ, warrant of attachment or execution or similar process is issued or levied against any of the Collateral or any other property of any Loan Party and is not released, vacated or fully bonded within 60 days after

15

its issue or levy; or

(k)     the occurrence of any "Event of Default" under and as defined in any other loan agreement between the Lender and the Borrower (whether relating to the Project or otherwise), including the building loan agreement referred to in and secured by the First Mortgage; or

(l)     any Guarantor purports to revoke, cancel or terminate its Guaranty prior to the termination date (if any) provided therein; or

(m)     any material adverse change shall occur in the financial condition, operations, properties or prospects of any Loan Party, or any event shall occur which has a material adverse impact on the Collateral or the Project; or

(n)     any Loan Party is in default or an event of default has occurred (with respect to any loan or other obligation owing by Loan Party to Lender) or on Loan Party's debt with any other lender.

7.02   Remedies of the Lender.  Upon the occurrence of any Event of Default, the Lender may, without notice to or demand upon the Borrower, which are expressly waived by the Borrower (except for notices or demands otherwise required by applicable Laws to the extent not effectively waived by the Borrower and any notices or demands specified in the Loan Documents), exercise any one or more of the following Remedies as the Lender may determine:

(a)     the Lender may, at its option, terminate all commitments to disburse the Loan, or to release any Collateral from the Mortgage, or the Lender may waive the Event of Default or, without waiving, determine, upon terms and conditions satisfactory to the Lender, to make the Disbursement, or to release any Collateral from the Mortgage;

(b)     the Lender may declare the unpaid principal of the Note and all accrued interest and other amounts payable under the Loan Documents to be immediately due and payable, in which event all such amounts shall immediately be due and payable without protest, presentment, notice of dishonor, demand or further notice of any kind, all of which are expressly waived by the Borrower;

(c)     the Lender may perform any of the Borrower's Obligations in such manner as the Lender may determine;

(d)     the Lender may, either directly or through an agent or court-appointed receiver, take possession of the Collateral and enter into such contracts and take such other action as the Lender deems appropriate to complete or partially construct all or any part of the Improvements, subject to such modifications and changes in the Project or the plan of development as the Lender may deem appropriate; and

(e)     the Lender may proceed to protect, exercise and enforce any and all other

15

16

Remedies provided under the Loan Documents or by applicable Laws.

All costs, expenses, charges and advances of the Lender in exercising any such Remedies (including any such amounts which cause the obligations of the Borrower to exceed the face amount of the Note) shall be payable by the Borrower to the Lender in accordance with § 5.12.

Each of the Remedies of the Lender provided in the Loan Documents is cumulative and not exclusive of, and shall not prejudice, any other Remedy provided in the Loan Documents or by applicable Laws. Each Remedy may be exercised from time to time as often as deemed necessary by the Lender, and in such order and manner as the Lender may determine. No failure or delay on the part of the Lender in exercising any Remedy shall operate as a waiver of such Remedy; nor shall any single or partial exercise of any Remedy preclude any other or further exercise of such Remedy or of any other Remedy. No application of payments, or any advances or other action by the Lender, will cure or waive any Event of Default or prevent acceleration, or continued acceleration, of amounts payable under the Loan Documents or prevent the exercise, or continued exercise, of any Remedies of the Lender.

8.00    Miscellaneous.

8.01    Waivers and Amendments. No supplement to, modification or amendment of, or waiver, consent or approval under, any of the Loan Documents shall be effective unless in writing and signed by the Lender, and any waiver, consent or approval shall be effective only in the specific instance and for the specific purpose for which given.

8.02    Survival of Representations. All Representations shall survive the making and repayment of the Loan and the expiration or termination of this Agreement and have been or will be relied upon by the Lender, notwithstanding any investigation made by the Lender or on its behalf.

8.03    Notices. All notices and other communications provided under any Loan Document shall be in writing and mailed or personally delivered to the appropriate party at the address set forth on the signature page of this Agreement or any other Loan Document or, as to any party, at any other address in the State of California as shall be designated by it in a written notice sent to the other party. All notices and other communications by the Borrower which are expressly subject to receipt by the Lender under the terms of the Loan Documents will be effective when received by an officer or other representative of the Lender having direct responsibility for administration of the Loan. In all other cases, any notice or other communication will be effective (a) if given by mail, on the earlier of receipt or the third day after deposit in the United States mails with first-class postage prepaid, or (b) if given by personal delivery, when delivered, provided that the requirements of this sentence shall not impair or delay the effectiveness of any notice or other communication given by the Lender under the Mortgage or any Additional Collateral Agreements when such notice or other communication is given in compliance with and would otherwise be effective under applicable Laws.

17

8.04    _Relationship of Parties_. The relationship between the Borrower and the Lender is, and at all times shall remain, solely that of debtor and creditor, and shall not be, or be construed to be, a joint venture, equity venture, partnership or other relationship of any nature, and the Lender neither undertakes nor assumes any responsibility or duty to the Borrower or to any other Person with respect to the Collateral, the Project or the Loan, except as expressly provided in the Loan Documents; and notwithstanding any other provision of the Loan Documents: (a) the Lender is not, and shall not be construed as, a partner, joint venturer, alter ego, manager, controlling person or other business associate or participant of any kind of the Borrower or its officers, directors, employees or agents and the Lender does not intend to ever assume such status; (b) the Lender shall in no event be liable for any debts, expenses or losses incurred or sustained by the Borrower; (c) the Lender's activities in connection with the Loan Documents shall not be "outside the scope of the activities of a lender of money" within the meaning of California Civil Code § 3434, as amended or recodified from time to time, and the Lender does not intend to ever assume any responsibility to any Person for the quality, suitability, safety or condition of the Collateral; and (d) the Lender shall not be deemed responsible for or a participant in any acts, omissions or decisions of the Borrower or its officers, directors, employees or agents.

8.05    _Nonliability of the Lender_. The Borrower acknowledges and agrees that:

(a)    the Borrower shall be solely responsible for and shall rely solely on its own judgment with respect to all matters relating to the Collateral or the Project, including the conduct of the Borrower and its agents and employees, the quality, adequacy and suitability of the Improvement Plans and any Change Orders and any work or materials furnished or to be furnished in connection with the Project, the skill, qualifications and performance of architects, contractors, subcontractors and suppliers, the feasibility of the Project and the sufficiency of budgets, cost projections and insurance, the supervision, status and progress of construction and compliance by the Borrower with the requirements of this Agreement with respect to such construction and the accuracy and completeness of any Disbursement Request, and the Lender does not assume any responsibility to the Borrower or any other Person to review, inspect, supervise or approve, or to provide any advice or information with respect to, any such matters;

(b)    inspections of construction made by or on behalf of the Lender, and acceptance, approval or review by the Lender of any Documents, information, conditions or performance or any other action by the Lender under any of the Loan Documents, are for purposes of administration of the Loan only and for the sole protection of the Lender, and shall not constitute a representation or warranty by the Lender to the Borrower or any other Person or be relied upon by the Borrower or any other Person for any other purpose;

(c)    the Lender shall have no responsibility or liability for any delays in funding or construction caused by any inspection of construction or review of Documents, information, conditions or performance or any other action by the Lender in connection with any Disbursement or Change Order; and

(d)    the Lender does not owe any duty of care to protect the Borrower or any

17

18

other Person against or to inform the Borrower or any other Person of, and the Lender shall not be responsible or liable to the Borrower or any other Person for any loss, damage, liability or claim of any kind relating to injury or death to persons or damage to property or other loss resulting from, the negligence or any other act or omission of the Borrower or any Lien Claimant or any other Person or any negligent, faulty, inadequate or defective design, building, construction or maintenance or any other condition or the improper application of any Disbursement.

8.06   Benefits and Assignment.   The Loan Documents are made for the purpose of defining the rights and obligations of the Loan Parties and the Lender in connection with the Loan and are intended for the sole protection of the Loan Parties and the Lender and the Lender's successors and assigns, and no other Person shall have any rights of any nature under or by reason of the Loan Documents. The Loan Documents shall be binding on and inure to the benefit of each of the Loan Parties and the Lender and their respective successors and assigns, except that no Loan Party shall have the right to assign any rights or interests under any Loan Document without the prior written consent of the Lender.   The Lender may from time to time sell participations in the Loan to any Person (including Affiliates of the Lender) without notice to or the consent of any Loan Party.

8.07   Payments and Computations.   All payments by any Loan Party under the Loan Documents shall be made in lawful money of the United States free and clear of, and without reduction by reason of, any Taxes. Any payment which is stated to be due on a day which is not a Banking Day shall be made on the next succeeding Lendering Day, and any such extension shall be included in the computation of the payment of interest. Whenever any interest or other amount payable under the Loan Documents is to be computed on the basis of a year of a specified number of days, the amount shall be calculated on the basis of a year of such specified number of days for the actual number of days (including the first, but excluding the last) occurring in the period for which such calculation is made. For purposes of calculating amounts paid or payable under the Loan Documents, credit for payments shall be given upon receipt of same day funds by the Lender at its office located at 3465 East Foothill Blvd., FH-01-09, Pasadena, California 91107, Attention: Homebuilder Division (or such other location specified by the Lender from time to time in writing) at or before the close of business, Los Angeles time, on any Banking Day. Except as otherwise expressly provided in the Loan Documents, all payments on the Obligations received by the Lender shall be applied to the Obligations in such order and manner as the Lender may determine.

8.08   Publicity.   During the course of construction of the Improvements and until the Loan is repaid in full, the Lender may place signs on the Land and issue or publish releases or announcements stating that construction financing is being provided by the Lender to the Borrower.

8.09   Rules of Construction.   (a) For purposes of this Agreement and the other Loan Documents: (i) any reference to "days" or "months" shall mean calendar days or months, (ii) the word "including" shall mean "including without limitation", (iii) any reference in any of the Loan

19

Documents to any Loan Document or other Document or exhibit shall mean such Loan Document or other Document or exhibit as it may from time to time be supplemented, modified, amended and extended in accordance with the terms of this Agreement, (iv) defined terms shall be equally applicable to the singular and plural forms, and (v) all existing and future exhibits to this Agreement are incorporated in this Agreement by this reference.  (b) Time is of the essence of the Loan Documents, and the provisions of the Loan Documents are declared to be severable.  (c) All accounting terms used and not otherwise defined in any Loan Document shall be construed in conformity with, and all financial information maintained or submitted by any Loan Party or other Person under any Loan Document shall be prepared in accordance with, generally accepted accounting principles consistently applied (or such other principles approved by the Lender in writing).  (d) If more than one Loan Party signs or is otherwise bound by any Loan Document, the liability of each shall be joint and several.  (e) The Loan Documents shall be governed by, and construed and enforced in accordance with, the Laws of Florida.

8.10    <u>Waiver of Jury Trial</u>.  Each of the Lender and the Borrower waive trial by jury in any action or other proceeding (including counterclaims), whether at law or equity, brought by the Lender or the Borrower against the other on matters arising out of or in any way related to or connected with this Agreement, the other Loan Documents, the Loan or any transaction contemplated by, or the relationship between the Lender and the Borrower or any action or inaction by either party under, any of the Loan Documents.

**[THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK;
SIGNATURE PAGE FOLLOWS]**

20

IN WITNESS WHEREOF, the Borrower and the Lender have caused this Agreement to be duly executed as of the date first written above.

"LENDER":                                        "BORROWER":

IBA, LLC, a Delaware                             BLUFF HOUSE, LLC, an
limited liability company                        Illinois limited liability company

By_____                              By:_____
Title:_____SVP_____                             Ganesan Visvabharathy, Manager

Lender's Address:                                Borrower's Address:
                                                 101 Burr Ridge Parkway, Suite 306
_____                Chicago, Illinois 60527

IBA, LLC
3465 E. Foothill Blvd., FH-01-09
Pasadena, California 91107                       ANASTASIA SHORES, LLC, an
Attn: Homebuilder Division                       Illinois limited liability company

                                                 By:_____
                                                 Ganesan Visvabharathy, Manager

                                                 Borrower's Address:
                                                 101 Burr Ridge Parkway, Suite 306
_____                Chicago, Illinois 60527

20

Loan No. 52-8600000                                        EXHIBIT "A"

## LEGAL DESCRIPTION OF LAND

A-1

*LP 786110.5\31849-60516*

EXHIBIT A

Legal Description

PARCEL ONE:   "BLUFF HOUSE" PHASE 1

A PARCEL OF LAND SITUATED IN GOVERNMENT LOT 2, SECTION 6, TOWNSHIP 4 SOUTH, RANGE 26 EAST, CLAY COUNTY, FLORIDA, SAID PARCEL BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGIN AT THE NORTHWEST CORNER OF LOT 10, BLOCK 1, MEADOWBROOK OAKS UNIT TWO, ACCORDING TO PLAT BOOK 16, PAGES 28, 29 AND 30 OF THE PUBLIC RECORDS OF SAID COUNTY; THENCE ON THE WEST LINE OF SAID SECTION 6, RUN NORTH 01 DEGREE 00 MINUTES 00 SECONDS WEST 850.00 FEET TO A WESTERLY PROLONGATION OF THE SOUTHERLY LINE OF WELLS ROAD; THENCE ON SAID PROLONGATION AND THE ON SAID SOUTHERLY LINE OF WELLS ROAD, SOUTH 88 DEGREES 41 MINUTES 00 SECONDS EAST 508.80 FEET; THENCE SOUTH 01 DEGREE 00 MINUTES 00 SECONDS EAST 785.89 FEET TO THE NORTH LINE OF LOMBARD STREET; THENCE ON SAID LINE SOUTH 89 DEGREES 43 MINUTES 40 SECONDS WEST 406.00 FEET TO THE WEST LINE OF SAID LOMBARD STREET; THENCE ON LAST SAID LINE SOUTH 01 DEGREE 00 MINUTES 00 SECONDS EAST 50.00 FEET TO THE NORTH LINE OF SAID LOT 10, BLOCK 1, MEADOWBROOK OAKS UNIT TWO; THENCE ON LAST SAID LINE SOUTH 89 DEGREES 43 MINUTES 40 SECONDS WEST 102.42 FEET TO THE POINT OF BEGINNING.

PARCEL TWO:   "ACCESS EASEMENT"

AN EASEMENT FOR INGRESS AND EGRESS COVERING A PARCEL OF LAND SITUATED IN GOVERNMENT LOT 2, SECTION 6, TOWNSHIP 4 SOUTH, RANGE 26 EAST, CLAY COUNTY, FLORIDA, SAID PARCEL BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE NORTHWEST CORNER OF LOT 10, BLOCK 1, MEADOWBROOK OAKS UNIT TWO, ACCORDING TO PLAT BOOK 16, PAGES 28, 29 AND 30 OF THE PUBLIC RECORDS OF SAID COUNTY; THENCE ON THE WEST LINE OF SAID SECTION 6, RUN NORTH 01 DEGREE 00 MINUTES 00 SECONDS WEST 850.00 FEET TO A WESTERLY PROLONGATION OF THE SOUTHERLY LINE OF WELLS ROAD; THENCE ON SAID PROLONGATION, RUN THE FOLLOWING 2 COURSES:   1). SOUTH 88 DEGREES 41 MINUTES 00 SECONDS EAST 184.62 FEET TO THE POINT OF BEGINNING;   2)  SOUTH 88 DEGREES 41 MINUTES 00 SECONDS EAST 27.84 FEET; THENCE NORTH 43 DEGREES 14 MINUTES 25 SECONDS EAST 15.94 FEET; THENCE NORTH 79 DEGREES 46 MINUTES 37 SECONDS EAST 19.00 FEET; THENCE SOUTH 88 DEGREES 10 MINUTES 02 SECONDS EAST 22.68 FEET TO THE WESTERLY LINE OF WELLS ROAD, ACCORDING TO PLAT BOOK 17, PAGES 7 THROUGH 12 OF SAID PUBLIC RECORDS; THENCE ON LAST SAID LINE NORTH 01 DEGREE 00 MINUTES 00 SECONDS WEST 28.85 FEET; THENCE NORTH 88 DEGREES 05 MINUTES 51 SECONDS WEST 77.00 FEET; THENCE SOUTH 03 DEGREES 23 MINUTES 06 SECONDS WEST 45.10 FEET TO THE POINT OF BEGINNING.

PARCEL THREE:   "BLUFF HOUSE" PHASE 2

A PARCEL OF LAND SITUATED IN SECTION 6, TOWNSHIP 4 SOUTH, RANGE 26 EAST, CLAY COUNTY,

FLORIDA; SAID PARCEL BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGIN AT THE NORTHWEST CORNER OF LOT 1, MEADOWBROOK UNIT 5, ACCORDING TO PLAT BOOK
6, PAGE 57 OF THE PUBLIC RECORDS OF SAID COUNTY; THENCE ON THE WEST LINE THEREOF,
SOUTH 01 DEGREE 09 MINUTES 30 SECONDS EAST 43.04 FEET, TO THE NORTH LINE OF CEDAR BEND,
ACCORDING TO PLAT BOOK 17, PAGES 7 THRU 12 OF SAID PUBLIC RECORDS; THENCE ON LAST SAID
LINE, SOUTH 89 DEGREES 43 MINUTES 40 SECONDS WEST 340.00 FEET; THENCE NORTH 01 DEGREE
09 MINUTES 30 SECONDS WEST 3.30 FEET; THENCE SOUTH 89 DEGREES 43 MINUTES 40 SECONDS
WEST 185.71 FEET TO THE EAST LINE OF CEDAR BEND DRIVE; THENCE ON LAST SAID LINE, RUN THE
FOLLOWING TWO COURSES:  1)  NORTH 01 DEGREE 00 MINUTES 00 SECONDS WEST 671.40 FEET;  2)
ON THE ARC OF A CURVE CONCAVE SOUTHEASTERLY AND HAVING A RADIUS OF 30.00 FEET, A
CHORD DISTANCE OF 43.28 FEET, TO THE SOUTH LINE OF WELLS ROAD, THE BEARING OF SAID
CHORD BEING NORTH 45 DEGREES 09 MINUTES 30 SECONDS EAST; THENCE ON LAST SAID LINE
SOUTH 88 DEGREES 41 MINUTES 00 SECONDS EAST, 529.83 FEET; THENCE SOUTH 01 DEGREE 14
MINUTES 15 SECONDS EAST 647.37 FEET; THENCE SOUTH 89 DEGREES 42 MINUTES 10 SECONDS
WEST 37.74 FEET, TO THE POINT OF BEGINNING.


PARCEL FOUR:  "ANASTASIA SHORES"

THE EAST 720 FEET OF GOVERNMENT LOT 2, SECTION 34, TOWNSHIP 7 SOUTH, RANGE 30 EAST, ST.
JOHNS COUNTY, FLORIDA, EXCEPTING THEREFROM THE SOUTHERLY 508 FEET; ALL MORE
PARTICULARLY DESCRIBED AS FOLLOWS:

FOR A POINT OF REFERENCE, COMMENCE AT THE NORTHWEST CORNER OF SAID SECTION 34, AS
ESTABLISHED BY THE PLAT OF WOODLAND, UNIT A, AS RECORDED IN MAP BOOK 10, PAGES 68 AND
69 OF THE PUBLIC RECORDS OF SAID COUNTY; THENCE SOUTH 89 DEGREES 18 MINUTES 30
SECONDS EAST ALONG THE NORTH LINE OF SAID SECTION 34, THE SAME BEING THE SOUTH RIGHT
OF WAY LINE OF POPE ROAD (AS NOW ESTABLISHED AS A 100 FOOT RIGHT OF WAY), A DISTANCE OF
1914.36 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE SOUTH 89 DEGREES 18 MINUTES 30
SECONDS EAST, ALONG SAID NORTH LINE OF SECTION 34, A DISTANCE OF 720.00 FEET; THENCE
SOUTH 00 DEGREES 37 MINUTES 41 SECONDS WEST, ALONG EAST LINE OF AFOREMENTIONED
GOVERNMENT LOT 2, THE SAME BEING THE WEST LINE OF THE LANDS AS RECORDED IN OFFICIAL
RECORDS VOLUME 355, PAGE 213 AND PARCEL "G" OF OFFICIAL RECORDS VOLUME 454, PAGE 176 A
DISTANCE OF 816.99 FEET; THENCE NORTH 89 DEGREES 22 MINUTES 55 SECONDS WEST, ALONG THE
NORTH LINE OF THE AFOREMENTIONED SOUTHERLY 508 FEET, A DISTANCE OF 720.00 FEET; THENCE
NORTH 00 DEGREES 37 MINUTES 41 SECONDS EAST PARALLEL WITH AND 720 FEET WESTERLY OF
THE AFOREMENTIONED EAST LINE OF GOVERNMENT LOT 2, A DISTANCE OF 817.91 FEET TO THE
POINT OF BEGINNING.

Loan No. 52-8600000                                              EXHIBIT "B"

## DISBURSEMENT SCHEDULE

The Disbursement of the Loan shall be made in accordance with the following terms, conditions and procedures:

(a)    Method of Disbursement.    Subject to fulfillment of all applicable conditions and the terms and procedures set forth in the Agreement and this Disbursement Schedule:    (i) the Disbursement shall be made on the basis of a Disbursement Request submitted (in duplicate) by the Borrower to the Lender, which shall certify as to the use of the proceeds of the Disbursement, and (ii) upon the Lender's approval of the Disbursement Request, the proceeds of the Disbursement shall be deposited into an account designated by the Borrower or into an escrow designated by the Borrower and approved by the Lender, except that (A) any portion of the proceeds of the Disbursement intended to pay amounts owing to the Lender shall be made by book entry, and (B) at the Lender's option, Disbursements may otherwise be made by the Lender directly to the Borrower, to the Contractor, if any, or to any other Lien Claimant, or jointly to one or more of such Persons or to other Persons designated by the Borrower, or in such other manner as the Lender may approve or require.

(b)    Use of Proceeds.    Unless the Lender otherwise consents, the proceeds of the Disbursement shall be used solely for the purposes specified in Exhibit "C".

(c)    Disbursement Procedures.    The Disbursement of the proceeds of the Loan shall be subject to prior receipt by the Lender, in form and substance satisfactory to the Lender, of each of the following items: (i) a Disbursement Request, submitted (in duplicate) by the Borrower, certifying that no Event of Default has occurred and is continuing and that all Representations made by the Borrower in any of the Loan Documents are correct in all material respects as of the date of the Disbursement Request, (ii) originals or copies of such bills, invoices, receipts, lien releases or waivers or other evidence of payment or information as the Lender may reasonably require, (iii) such indorsements to the Title Policy and such other Documents and information relating to the Collateral or the Project as the Lender may reasonably request, and (iv) the "Required Items" described in Exhibit "C".

Unless the Lender otherwise consents, the Lender shall not be obligated to make the Disbursement if (A) the Lender has determined that an Event of Default has occurred and is continuing or that any Representation made by the Borrower in any of the Loan Documents would not be correct in all material respects if made on and as of the date of the Disbursement, or (B) the Lender is required under applicable Laws to withhold the Disbursement or a stop notice has been asserted against the Lender and has not been fully released, or (C) the Lender has determined that any Liens or Rights of Others, other than Permitted Prior Exceptions, may have

*B-1*

priority over the Mortgage with respect to the Disbursement.

*B-2*