EXHIBIT A
Cont.

EXHIBIT "C"

## LOAN REQUIREMENTS

Borrower:　　BLUFF HOUSE, LLC, an Illinois limited liability company
　　　　　　　　ANASTASIA SHORES, LLC, an Illinois limited liability company

Project:　　Bluff House/Anastasia Shores

Loan Amount:　$9,500,000.00

Loan Fee:　$190,000.00, to be paid out of pocket by Borrower at closing

Use of Proceeds: funding $8,190,000.00 to assist with Project purchase and an interest reserve of $1,310,000.00

A.　　Required Items (to be furnished by the Borrower prior to Disbursement):

　　1.　　Promissory Note in the face amount of $9,500,000.00 executed by the Borrower in favor of the Lender to evidence the Loan.

　　2.　　Construction Mortgage with Assignment of Rents, Security Agreement and Fixture Filing executed by the Borrower in favor of the Lender to secure the Loan and other Obligations of the Borrower, which shall cover the Real Property, certain Personal Property, the Project Agreements, the Improvement Plans and such other rights, properties and interests relating to the Project or any other Collateral as the Lender may require.

　　3.　　Financing statement executed by the Borrower in favor of the Lender with respect to such Collateral as the Lender may require.

　　4.　　Secured Environmental Indemnity executed by the Borrower.

　　5.　　General Guaranty of all Obligations of the Borrower executed by Ganesan Visvabharathy.

　　6.　　Completion Guaranty executed by Ganesan Visvabharathy.

*C-1*

7. Environmental Guaranty executed by Ganesan Visvabharathy.

8. Cash Collateral Agreement executed by Borrowers and consented to by the bank where the Cash Collateral Account is maintained.

9. Cash Collateral Agreement relating to net operating income executed by Borrowers.

10. Authorizing Resolutions for each Loan Party.

11. Charter Documents for each Loan Party.

12. Opinion of counsel for the Loan Parties from Arnstein & Lehr LLP (covering the due authorization, execution and delivery of the Loan Documents, the enforceability of the Loan Documents and such other matters as the Lender may reasonably require).

13. Current Financial Statements for Ganesan Visvabharathy.

14. Evidence of insurance required by § 5.08.

15. Assignment of Project Documents executed by the Borrower.

16. Copies of permits.

17. Copy of preliminary title report and recorded exceptions.

18. Evidence of compliance with zoning/zoning endorsement and other land use restrictions.

19. Environmental investigative report prepared by Aerostar Environmental Services, Inc.

20. Appraisal(s) prepared by the Lender or an appraiser approved by the Lender confirming the prospective market value of (A) the Anastasia Property, assuming completion of the Improvements to be constructed on the Anastasia Property, to be not less than $30,280,000.00, and (B) the Bluff Property, assuming completion of the Improvements to be constructed on the Bluff Property, to be not less than $32,900,000.00.

21. Evidence of Utility Services.

22.   Copy of any proposed CC&R's or easements, when available.

23.   Copy of budget for homeowners association, when available.

24.   Statement of conditions for transfer of common areas to homeowners association, when available.

25.   Copies of preliminary Condominium Declarations, when available.

26.   List of bonds, security deposits, set aside letters or letters of credit required in connection with the Project.

27.   Copy of project budget.

28.   Evidence of recording/filing of Mortgage/financing statement.

29.   Confirmation that Title Policy has been or will be issued at or prior to Disbursement.

30.   UCC searches showing financing statement executed by the Borrower to be a second priority filing.

31.   Evidence that the Loan Fee and all closing costs payable by the Borrower under § 5.12 have been or will be paid at or prior to the recordation of the Mortgage.

32.   Evidence that Borrower has contributed cash equity of at least $3,000,000.00 at the time of closing.

33.   2003 Tax Return Certification – Ganesan Visvabharathy.

34.   First Lender Loan Documents.

35.   Receipt and review of final cost review.

B.   <u>Additional Matters</u> (including disclosure of finder's or broker's fees, Special Taxes, flood conditions, development conditions or impediments, and pending or unissued consents and approvals):

C.   <u>Presale Requirements</u>:

1.   No sales of Units in any Building shall be closed and no common areas shall be transferred

to any homeowners association until at least 50% of the Units in such Building have become "sold" Units.

2.  Unless the Lender otherwise consents in writing, no "Model Units" shown on Exhibit "D" shall be sold or closed until all other Units in the Project of the same type have become "sold" Units or "closed" Units.

As used in Part C of this Exhibit:  (a) a "closed" Unit means a Unit as to which title has been conveyed to the purchaser, and (b) a "sold" Unit means a Unit as to which a purchaser (other than the Borrower or an Affiliate of the Borrower) has entered into a binding agreement to purchase the Unit for an amount not less than the "Minimum Sales Price" set forth on Exhibit "D" and has paid a nonrefundable deposit to the Borrower, and escrow instructions have been executed by the Borrower and the purchaser.

D.  Financial Covenants:

1.  Borrower shall provide or cause to provide to Lender until the Loan is paid in full:

a.  Financial Statement for Borrower after the end of each fiscal year end within 120 days prepared in accordance with generally accepted accounting principals consistently applied;

b.  Financial Statement for Guarantor after the end of each fiscal year end within 120 days prepared in accordance with generally accepted accounting principals consistently applied;

c.  Financial Statement for Borrower after the end of each quarter end within 45 days prepared in accordance with generally accepted accounting principals consistently applied;

d.  Financial Statement for Guarantor after the end of each quarter end within 45 days prepared in accordance with generally accepted accounting principals consistently applied;

e.  Federal Tax Returns with all schedules including K-1, if applicable, for Borrower within 30 days of filing;

f.  Federal Tax Returns with all schedules including K-1, if applicable, for Guarantor within 30 days of filing;

C-4

2.  Borrower acknowledges that net worth is a significant consideration to Lender in connection with the making of the Loan. Accordingly, Borrower agrees that the failure by Ganesan Visvabharathy to maintain the following financial capabilities shall constitute an Event of Default.

   a.  tangible net worth of Ganesan Visvabharathy as of the end of each calendar year in an amount not less than Thirty-Five Million ($35,000,000.00). Tangible Net Worth shall mean the excess of Assets over Liabilities, excluding, however from the determination of Assets: (i) all assets that would be classified as intangible assets under GAAP, including without limitation, goodwill (whether representing the excess of cost over book value of assets acquired or otherwise), negative goodwill, patents, trademarks, trade names, copyrights, franchises and deferred charges (including without limitation, unamortized debt discount and expense, organization costs and research and development costs); and (ii) subordinated debt.

   b.  liquid assets of Ganesan Visvabharathy not less than Three Million Dollars ($3,000,000.00) as of the end of each calendar quarter through and including December 30, 2005 and not less than Six Million Dollars ($6,000,000.00) commencing December 31, 2005 and as of the end of each calendar quarter thereafter. Liquid assets shall mean cash or readily marketable publicly traded securities traded or nationally recognized public exchange.

E.  Other Requirements:

1.  Condominium Declaration. Prior to the closing of the first Unit, the Borrower shall record the Condominium Declaration for the Project which Condominium Declaration shall be subject to Lender's approval, which approval shall not be unreasonably withheld.

2.  Absorption Rate. Commencing in the seventh month after the date of this Agreement, the Borrower shall cause not less than 18 Units per month to be sold during each three-month period, calculated on a rolling three-month basis.

3.  Sales Start Date. The Borrower shall cause the first Unit to be available for sale no later than 240 days after the date of this Agreement.

4.  Speculative Units. Borrower shall not cause, suffer or permit the number of Speculative

C-5

Units to exceed 40 at any time.   A Speculative Unit shall be defined as Unit that is incomplete and unsold.

5.   Standing Inventory.   Borrower shall not cause, suffer or permit the number of Standing Inventory Units to exceed 40 at any time.   A Standing Inventory Unit shall be defined as Unit that is complete and unsold.

6.   Maximum Number of Units Under Construction.   N/A.

7.   Letter of Credit.   As additional security for the Obligations, Borrower shall obtain a letter of credit in a face principal amount of not less than $1,000,000.00 from a bank acceptable to Lender and having a maturity date of at least 30 days after the Maturity Date.   Within two (2) weeks of the initial disbursement of the Loan, Borrower shall provide Lender with written confirmation of such letter of credit from LaSalle Bank National Association. Notwithstanding anything to the contrary contained in this Agreement, Lender shall be under no obligation to make any further disbursements of the Loan unless and until Lender receives such written confirmation.   Failure of Borrower to provide Lender with such written confirmation within two (2) weeks of initial disbursement shall be an Event of Default under this Agreement without any further action by Lender.   The beneficiary of such letter of credit shall be IndyMac Bank, F.S.B., as agent for Lender and First Lender.   The beneficiary shall have the right to draw on such letter of credit on demand at any time, whether before or after an Event of Default.   The proceeds of such letter of credit shall be used first, to pay off Borrower's obligations to First Lender relating to the Senior Loan, then, after such obligations relating to the Senior Loan have been paid in full, to pay off Borrower's obligations to Lender relating to this Loan.



# IndyMac Bank.
## Homebuilder Division



LOAN BUDGET SUMMARY EXHIBIT "D"
Villas Development
Anastasia Shores / Bluff House 2nd TD

| Cost Category | IndyMac 2nd TD (gap) |
|---|---|
| **Land (1000)** | $8,190,000 |
| Land Cost | $8,190,000 |
| | $0 |
| | $0 |
| **Site Costs (2000)** | $0 |
| On-Site Work | $0 |
| Off-Site Work | $0 |
| **Direct Construction Costs (3000)** | $0 |
| Direct Construction Costs | $0 |
| **Indirect Construction Costs (4000)** | $0 |
| Developer O/H (3% of sales max) | $0 |
| Permits and Fees | $0 |
| Arch / Eng | $0 |
| Project Indirects | $0 |
| Apt Op Expenses / Buyout Fees | $0 |
| Taxes/Ins/Misc | $0 |
| Legal/ Acctg/ Misc./HOA | $0 |
| **Sales / Marketing Costs (5000)** | $0 |
| On-Going Marketing | $0 |
| Start Up Marketing | $0 |
| Model Landscape / Furnishing | $0 |
| **Financing Costs (6000)** | $1,310,000 |
| 1st TD Interest Reserve | $0 |
| 1st TD Loan Fee | $0 |
| Closing Costs | |
| 2nd TD Interest Reserve | $1,310,000 |
| 2nd TD Loan Fee | $0 |
| **General Contingency (7000)** | |
| Contingency | $0 |
| **Total** | $9,500,000 |

Loan No. 52-8600000
(Second Mortgage)

EXHIBIT "E"
MINIMUM RELEASE PRICES

| | Approximate Unit Size | No. of Units | Release Prices |
|---|---|---|---|
| Anastasia Shores | 908 SqFt | 164 | $18,500.00 |
| Bluff House | 825 SqFt | 68 | $7,000.00 |
| Bluff House | 1,200 SqFt | 126 | $8,500.00 |
| Bluff House | 1,250 SqFt | 72 | $9,000.00 |
| Bluff House | 1,510 SqFt | 26 | $10,500.00 |
| Total No. of Units | | 456 | |

When the Senior Loan is repaid in full, the "Release Price" for each Lot/Unit shall be 100% of the net sales price (which shall mean the Total Sales Price less (A) the lesser of (i) reasonable and customary closing costs paid by the Borrower including sales commissions, escrow fees, title insurance premiums, transfer taxes, prorations for real property taxes and other similar charges, or (ii) 6% of the Total Sales Price.

Total Sales Price shall not be less than the following amount:

| | Approximate Unit Size | No. of Units | Total Sales Price/Appraised Value |
|---|---|---|---|
| Anastasia Shores | 908 SqFt | 164 | $200,000 |
| Bluff House | 825 SqFt | 68 | $110,000 |
| Bluff House | 1,200 SqFt | 126 | $135,000 |
| Bluff House | 1,250 SqFt | 72 | $140,000 |
| Bluff House | 1,510 SqFt | 26 | $160,000 |
| Total No. of Units | | 456 | |

Loan No. 52-8600000                                                           EXHIBIT "E"

**DEFINITIONS**

As used in this Agreement, the following terms shall have the following meanings:

"Acceptable Sales Contract" means a firm and binding sale contract for a Unit, in form and substance previously approved by Lender, subject to changes thereto requested by the purchaser and agreed to by Borrower exercising prudent business judgment, and, in addition to complying therewith and with any other applicable provision of this Agreement, such sale contract shall (a) be entered into with a financially responsible purchaser, (b) provide that the purchase price for such Unit be not less than the Minimum Sales Price applicable to such Unit, (c) require purchaser to make a non-refundable earnest money deposit of not less than 5% of the amount of the Sales Contract, (d) provide for closing of such Unit upon substantial completion of the Unit or, if said Unit is substantially completed on the date Borrower and the purchaser enter into such purchase contract, within six (6) months from the date of said purchase contract and (e) not contain any conditions precedent to the purchaser's obligations thereunder which have not been satisfied or waived by such purchaser.

"Additional Collateral Agreements" means the "Additional Collateral Agreements" (if any) specified in Exhibit "C" and any other mortgages, assignments or other agreements (other than the Mortgage) now or in the future securing the Loan or any Guaranty.

"Affiliate" means, as to any Person, any other Person that directly or indirectly controls or is controlled by or under common control with the Person specified.

"Agreement" means this Loan Agreement, including all exhibits.

"Alternate Rate" means the "Alternate Rate" set forth in the Note.

"Anastasia Property" shall have the meaning set forth in § 1.00 of this Agreement.

"Architect" means any Person engaged by the Borrower from time to time as an architect or to perform similar functions in connection with the Project.

"Architect Agreement" means, as to any Architect, the agreement between the Borrower and the Architect relating to services to be provided by the Architect in connection with the Project.

"Authorization" means any authorization, consent, approval, order, license, permit, exemption or other action by or from, or any filing, registration or qualification with, any Governmental Agency or other Person.

*F-1*

LP 786110.5 \ 31849-60516

"Authorizing Resolutions" means (a) in the case of a corporation, a certified copy of resolutions adopted by its board of directors, (b) in the case of a partnership (whether general or limited), a certificate signed by all of its general partners, and (c) in the case of a trust or any other entity, evidence of such other action as the Lender may require, in each case authorizing the execution, delivery and performance of all Loan Documents to which it is a party or by which it is bound.

"Banking Day" means any day (excluding Saturdays and Sundays) on which banks located in Florida are not authorized or required by law to close.

"Bluff Property" shall have the meaning set forth in § 1.00 of this Agreement.

"Cash Collateral Account" means a cash collateral account maintained by the Lender for the account of the Borrower for purposes of this Agreement or any of the other Loan Documents which shall be subject to a security interest in favor of the Lender for the purpose of securing the Borrower's Obligations and over which the Lender shall have sole and exclusive control and right of withdrawal.

"Change Order" means a change in, or supplement to, the Improvement Plans.

"Charter Documents" means (a) in the case of a corporation, its articles of incorporation and bylaws, (b) in the case of a limited liability company, its articles of organization and operating and/or management agreement, (c) in the case of a partnership, its partnership agreement and any certificate or statement of partnership, and (d) in the case of a trust or any other entity, its formation documents, in each case as amended from time to time.

"Collateral" means all property in which the Lender is granted or purportedly granted a Lien pursuant to the Mortgage.

"Competing Project" means any residential housing improvements or units which are located within a radius of five (5) miles of the Project.

"Condominium Declaration" shall mean, individually, and "Condominium Declarations" shall mean, collectively, the documents by which the Project will be submitted to the Florida Condominium Statute (the "Act"), prepared in accordance with the Act and which establishes the rights and easements in connection with the Project for the benefit of all future owners of the Unit

"Contractor" means any Person engaged by the Borrower from time to time as a general contractor in connection with the Project.

"Declarations" means the Condominium Declarations and those declarations (and supplemental declarations) of covenants, conditions and restrictions described in the Title Policy

E-2

(or subsequently recorded by or on behalf of the Borrower, with the Lender's prior written consent) and governing the development of the Project.

"Default Date" means the date on which all amounts owing to the Lender under the Loan Documents become due and payable at the option of the Lender upon the occurrence of an Event of Default.

"Disbursement" means the disbursement of the proceeds of the Loan.

"Disbursement Request" means a written request for a Disbursement in a form approved by the Lender.

"Disbursement Schedule" means the "Disbursement Schedule" attached as Exhibit "B".

"Documents" means written documents and materials, including agreements, approvals, certificates, consents, instruments, financing statements, reports, budgets, forecasts and opinions.

"Environmental Indemnity" means the Environmental Indemnity executed by the Borrower in favor of the Lender and described in Exhibit "C".

"Events of Default" means the events set forth in § 7.01.

"Final Sale Date" means the Sale Date on which the last Unit which has not previously become a Sold Unit becomes a Sold Unit, provided that the Final Sale Date shall not be deemed to have occurred on any date unless all Units have become Sold Units pursuant to Permitted Sales on or prior to such date.

"Financial Statements" means balance sheets and income statements.

"First Lender" shall mean IndyMac Bank, F.S.B.

"First Mortgage" means the construction mortgage executed by the Borrower in favor of the First Lender with respect to the Real Property to secure a first mortgage construction loan made by the First Lender to the Borrower to finance the development of the Project.

"Flood Hazard Area" means an area which has been designated as a special flood hazard area or subject to comparable risks by the Federal Emergency Management Agency or any successor to such Agency.

"Governmental Agency" means (a) any government or municipality or political subdivision of any government or municipality, (b) any assessment, improvement, community facilities or other special taxing district, (c) any governmental or quasi-governmental agency, authority,

E-3

board, bureau, commission, corporation, department, instrumentality or public body, (d) any court, administrative tribunal, arbitrator, public utility or regulatory body, or (e) any central bank or comparable authority.

"Guarantor" means any Person who has executed or is required to execute a Guaranty, and such Person's successors and assigns.

"Guaranty" means any Guaranty executed in favor of the Lender and described in Exhibit "C".

"Improvement Plans" means the improvement plans and specifications described in Exhibit "C", as modified by any Change Orders approved by the Lender.

"Improvements" means the Units and other improvements, including site development work (if any), constructed or to be constructed pursuant to the Improvement Plans.

"Land" means the land described in Exhibit "A".

"Laws" means all federal, state and local laws, rules, regulations, ordinances and codes.

"Lien" means any lien, mortgage, deed of trust, pledge, security interest or other charge or encumbrance.

"Lien Claim" means (a) any mechanics lien affecting any of the Collateral, (b) any stop notice affecting the undisbursed portion of the Loan, (c) any right of any Person to assert or maintain any such mechanics lien or stop notice, and (d) any other claim to payment by any Lien Claimant.

"Lien Claimant" means the Contractor, if any, and any other Person who has furnished labor, service, equipment or material in connection with the Project or who is otherwise entitled to payment for any Project Costs.

"Loan" means the loan to be made by the Lender to the Borrower pursuant to this Agreement in an amount not to exceed the Loan Amount.

"Loan Amount" means the amount of the Loan set forth in § 1.00.

"Loan Documents" means this Agreement, the Note, the Mortgage, the Environmental Indemnity, the Guaranties, if any, and any Additional Collateral Agreements.

"Loan Fee" means a nonrefundable loan fee to be paid by the Borrower to the Lender at or prior to the time of recordation of the Mortgage in the amount set forth in Exhibit "C".

E-4

"Loan Party" means (a) the Borrower, (b) any Guarantor which at the time has or may have any obligation or liability (whether fixed, contingent or otherwise) under the Guaranty executed or to be executed by it, (c) any Person executing any Additional Collateral Agreements, and (d) in the case of any Loan Party which is a partnership, any general partner of such Loan Party.

"Maturity Date" means the maturity date of the Note, as such maturity date may be extended from time to time.

"Mortgage" means the Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing executed by the Borrower to secure the Loan.

"Net Proceeds" means, with respect to any Sale, an amount equal to the total sales price less reasonable and customary closing costs paid by the Borrower (in an aggregate amount not to exceed ___% of the total sales price) consisting of sales commissions, escrow fees, recording and filing fees, title insurance premiums, transfer taxes, and prorations for real property taxes and other similar charges, in each case to the extent paid to a Person other than the Borrower or an Affiliate of the Borrower or otherwise approved by the Lender in its discretion.

"Note" means the Promissory Note executed by the Borrower in favor of the Lender to evidence the Loan.

"Obligations" means all obligations of the Borrower of every nature under the Loan Documents.

"Other Requirements" means (a) the terms, conditions and requirements of all Project Agreements, Authorizations and Rights of Others relating to the Collateral or the Project and all other Documents, agreements and restrictions relating to, binding on or affecting the Collateral or the Project, including the Declarations and other covenants, conditions and restrictions, leases, easements, reservations, rights and rights-of-way, (b) requirements relating to the sale or transfer of individual Units or common areas or portions of common areas or the supply of Utility Services to the Real Property, (c) requirements and recommendations of the soils report and any environmental impact report or negative declaration, (d) all building, zoning, land use, planning and subdivision requirements, and (e) requirements relating to construction of any offsite improvements.

"Parking Spaces" shall mean a parking space in the Project which may either be a Unit or a limited common element.

"Permitted Exceptions" means (a) Liens in favor of the Lender, (b) Permitted Prior Exceptions, and (c) other matters expressly approved by the Lender in writing which are subject and subordinate to the Lien of the Mortgage.

"Permitted Prior Exceptions" means (a) general ad valorem real property taxes which are

not delinquent, (b) Special Taxes described in Part B of Exhibit "C" or otherwise approved in writing by the Lender which in each case are not delinquent, (c) mechanics liens affecting the Real Property and arising from the construction of the Improvements, over which the Title Policy has insured the priority of the Lien of the Mortgage, (d) the First Mortgage, and (e) such other matters as the Lender shall expressly approve in writing as "Permitted Prior Exceptions" for purposes of this Agreement.

"Permitted Sale" means a Sale as to which all of the following conditions have been satisfied:

(a)    the Sale is made in the ordinary course of business for cash (which is paid on the Sale Date) in an amount not less than the applicable "Minimum Sales Price" set forth in Exhibit "D";

(b)    all "Presale Requirements" set forth in Exhibit "C" have been satisfied;

(c)    the buyer is an independent willing third party who is not affiliated with the Borrower and the Sale represents a bona fide arm's-length transaction; and

(d)    the Borrower has paid to the Lender, on the Sale Date, the Net Proceeds of the Sale (for application as provided in §§ 4.01 and 4.02).

The term "Permitted Sale" shall also include any other Sale approved in writing by the Lender in its sole discretion.

"Permitted Transfer" means (a) any Permitted Sale and any other sale or other transfer of Units and common areas (or undivided interests in common areas), in each case to the extent permitted by § 4.05, and (b) any transfer or other disposition of Personal Property permitted by § 4.06.

"Person" means any person or entity, whether an individual, trustee, corporation, partnership, limited liability company, joint stock company, trust, unincorporated organization, bank, business association or firm, joint venture, Governmental Agency or otherwise.

"Personal Property" means tangible personal property and fixtures, including building materials and supplies, appliances, furnishings, equipment and other "Goods" (as defined in the Mortgage), but excluding construction equipment of a type intended for use in connection with other projects.

"Project" means the project for the acquisition and/or refinancing of the Land, the construction of the Improvements, the acquisition and installation of certain Personal Property and the development of the Land in accordance with the Improvement Plans, and the marketing and sale of Units.

E-6

"Project Agreements" means (a) the Architect Agreement, the Construction Contract, if any, any Financing Commitment and any other takeout, refinancing or permanent loan commitment issued or assigned to the Borrower with respect to the Real Property, and (b) all leases, rental agreements, service and maintenance agreements, purchase and sale agreements, purchase options and other agreements of any nature relating to the Collateral or the Project, including agreements with contractors, subcontractors, suppliers, project managers and supervisors, designers, architects, engineers, sales agents and consultants, and (c) the Condominium Declarations.

"Project Costs" means all costs and expenses of any nature relating to the Project or the financing of the Project.

"Real Property" means the Land and the Improvements and all other buildings, structures and improvements now or in the future located on the Land.

"Remedy" means any right, power or remedy.

"Representations" means the representations and warranties of the Borrower set forth in § 5.00 and all other representations, warranties and certifications to the Lender in the Loan Documents or in any other Document delivered under or in connection with the Loan Documents.

"Right of Others" means, as to any property in which a Person has an interest, any legal or equitable claim or other interest (other than a Lien but including a leasehold interest, a right of first refusal or a right of repossession or removal) in or with respect to such property held by any other Person, and any option or right held by any other Person to acquire any such claim or other interest or any Lien in or with respect to such property.

"Sale" means a sale or other disposition of all or any part of the Real Property by the Borrower.

"Sale Date" means, with respect to any Sale, the earlier of (a) the close of escrow or (b) conveyance of title to the buyer or transferee.

"Sold Unit" means a Unit as to which the Sale Date has occurred.

"Special Tax" means, as to any property, (a) any special assessment or other Tax which is or may become a Lien affecting such property, other than general ad valorem real property taxes, and (b) any assessment, improvement, community facilities or other special taxing district in or into which such property is or may be located or incorporated or under which any special assessment or other Tax which is or may become a Lien affecting such property is or may be imposed.

E-7

"Takeout Commitment" means a commitment issued by an institutional lender to make permanent loans to purchasers of Units.

"Taxes" means all taxes, assessments, charges, fees and levies (including interest and penalties) imposed, assessed or collected by any Governmental Agency.

"Title Policy" means an ALTA extended coverage lender's policy of title insurance in form and substance satisfactory to the Lender, issued by an insurer selected by the Borrower and satisfactory to the Lender, together with such indorsements and policies of coinsurance and/or reinsurance as may be required by the Lender, in a policy amount equal to the Loan Amount, insuring the Mortgage to be a valid second priority Lien on the Land and showing the Land to be subject only to the First Mortgage and other Permitted Prior Exceptions.

"Unit" shall mean each residential condominium unit (and, in the event the Condominium Declaration establishes parking spaces as units, each Parking Space) within the Project.

"Utility Services" means all utility services, including water, gas, electricity, telephone, garbage removal and sewer services.

E-8

PLAINTIFF'S
EXHIBIT
3

0728-2005

Loan No. 52-8600000

## GENERAL GUARANTY

(Real Estate Secured Loan)
(Mezzanine Loan)

TO:  IBA, LLC, a Delaware limited liability company

THIS GENERAL GUARANTY ("Guaranty"), dated July 28, 2005, is made by Ganesan Visvabharathy, individually (the "Guarantor"), in favor of IBA, LLC, a Delaware limited liability company (the "Lender"), and is executed pursuant to the Building Loan Agreement dated as of the date of this Guaranty among the Lender and BLUFF HOUSE, LLC, an Illinois limited liability company and ANASTASIA SHORES, LLC, an Illinois limited liability company (individually and collectively, the "Borrower") (such Loan Agreement, as it may from time to time be supplemented, modified and amended, being referred to in this Guaranty as the "Agreement"), the provisions of which are incorporated in this Guaranty by reference.  The Agreement provides, among other things, for rules of construction which apply to this Guaranty.  Capitalized terms used in this Guaranty and not otherwise defined are used with the meanings set forth in the Agreement.

Subject to the terms and conditions set forth in the Agreement, the Lender has agreed to make a loan to the Borrower in the amount of $9,500,000.00 (the "Loan") to finance the real estate project of the Borrower known as Anastasia Shores, St. Augustine Beach, Florida and The Bluff House, Orange Park, Florida  (the "Project").  The Loan will be secured by a Mortgage executed by the Borrower with respect to the Project.  As a condition of the obligation of the Lender to make the Loan, the Guarantor is required to execute and deliver to the Lender this Guaranty.

To induce the Lender to make the Loan and for other valuable consideration, the Guarantor agrees as follows:

1.    Guaranteed Obligations.  The Guarantor absolutely and unconditionally guarantees the punctual and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the following (the "Guaranteed Obligations"):  (a) all present and future indebtedness evidenced by the Note dated the date of this Guaranty in the face principal amount of $9,500,000.00 executed by the Borrower to the order of the Lender, including principal, interest and all other amounts payable under the terms of the Note; and (b) all other present and future obligations of the Borrower to the Lender under the Loan Documents (including any Environmental Indemnity executed by the Borrower in favor of the Lender and obligations in respect of Letters of Credit and Set Aside letters); in each case as such indebtedness and other obligations may from time to time be supplemented, modified, amended, renewed and extended, whether evidenced by new or additional Documents or resulting in a change in the interest rate on any indebtedness or otherwise.  Upon the occurrence of any Event of Default, all Guaranteed Obligations shall, at the option of the Lender, immediately become due and payable by the Guarantor without protest, presentment, notice of dishonor, demand or further notice of any kind, all of which are expressly waived by the

Guarantor, and irrespective of whether any Guaranteed Obligations have then become due and payable by the Borrower or any other Loan Party (each of the Borrower and any other Loan Party other than the Guarantor being referred to in this Guaranty as an "other Loan Party").

2.     Nature of Guaranty.  This Guaranty is a guaranty of payment and performance and not of collection and applies to all Guaranteed Obligations, whether existing now or in the future, including (a) interest and other Guaranteed Obligations arising or accruing after bankruptcy of any Loan Party or any sale or other disposition of any security for this Guaranty or for the obligations of any other Loan Party (any such security being referred to in this Guaranty as the "Security"), and (b) any Guaranteed Obligations that survive repayment of the Loan.  This Guaranty is in addition to the Completion Guaranty and Environmental Guaranty, each given by Guarantor to Lender as of the date hereof, as may be confirmed, reaffirmed and/or amended from time to time.  This Guaranty and any Security for this Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment or performance of any Guaranteed Obligations is rescinded or must otherwise be returned by the Lender or any other Person upon the bankruptcy, insolvency or reorganization of any Loan Party or otherwise, all as though such payment or performance had not occurred.  The Guarantor shall have no authority, and hereby waives any right, to revoke this Guaranty, but if any purported revocation shall be deemed to have occurred by operation of law or otherwise, the provisions of this Guaranty shall continue to apply notwithstanding such revocation.

3.     Obligations Independent.  The obligations of the Guarantor under this Guaranty are independent of the obligations of any other Loan Party under the Loan Documents (such obligations of any other Loan Party, including the Borrower's obligations in respect of the Guaranteed Obligations, being referred to in this Guaranty as the "Other Obligations") and any Security, and the enforceability of any Security for this Guaranty is likewise independent of any such Other Obligations and any other Security.  The Lender may bring action against the Guarantor and otherwise enforce this Guaranty or any Security for this Guaranty without bringing action against any other Loan Party or joining any other Loan Party in any action against the Guarantor, and otherwise independently of any other Remedy that may be available to the Lender at any time with respect to any Other Obligations or Security.  The Guarantor waives any right to require the Lender at any time to proceed against any other Loan Party, apply any Security or otherwise enforce, proceed against or exhaust any Other Obligations or Security or pursue any other Remedy in the Lender's power.

4.     Action with Respect to Other Obligations or Security.  The Guarantor authorizes the Lender, without notice or demand and without affecting its liability under or the enforceability of this Guaranty or any Security for this Guaranty, from time to time to:    (a) supplement, modify, amend, renew, extend, accept partial payments or performance on or otherwise change the time, manner or place of payment or performance or the interest rate or other terms or the amount of, or release, reconvey, terminate, waive, abandon, subordinate, exchange, substitute, transfer or consent to the transfer of or enter into or give any other agreement, approval, waiver or consent with respect to or in exchange for any Other Obligations or Security or any of the Loan Documents; (b) receive and hold additional Security or guaranties; (c) release any other Loan Party from any personal liability with respect to any Other Obligations and participate in any bankruptcy or reorganization of any other Loan Party in such manner as the Lender may determine; and (d) accelerate, settle, compromise, compound, sue

for, collect or otherwise liquidate, enforce or deal with any Other Obligations or Security (including judicial or nonjudicial sale or other disposition of any Security), bid and purchase at any sale or other disposition of any Security and apply any Security and any proceeds or other payments received by the Lender, in each case in such order and manner as the Lender may determine.

     5.    <u>Waiver of Defenses</u>.  The Guarantor waives any defense to the enforcement of this Guaranty or any Security for this Guaranty arising by reason of: (a) any present or future Laws or orders affecting the terms of, or the Lender's Remedies with respect to, any Other Obligations or Security; (b) the absence or cessation of personal liability of any other Loan Party with respect to any Other Obligations; (c) the failure of any other Person to execute this Guaranty or any other guaranty or agreement; (d) the failure of any Loan Party to properly execute any Loan Document or otherwise comply with applicable legal formalities; (e) the unenforceability or invalidity of any Other Obligations or Security or the lack of perfection or failure of priority or any other loss or impairment of any Security; (f) any discharge or release of any other Loan Party or any Other Obligations or Security or any impairment or suspension of any Remedies of the Lender, whether resulting from any act or omission of the Lender or any other Person or by operation of law or otherwise; (g) any bankruptcy, insolvency or reorganization of any Loan Party or any disability or other defense of any other Loan Party with respect to any Other Obligations or Security; (h) any failure of the Lender to disclose to the Guarantor any information relating to the financial condition, operations, properties or prospects of any other Loan Party now or in the future known to the Lender (the Guarantor waiving any duty on the part of the Lender to disclose such information); (i) any failure of the Lender to monitor proper application of loan funds or compliance with the Loan Documents, or to preserve, insure or protect any Security or any subrogation, contribution or reimbursement rights of the Guarantor; (j) any application of proceeds or payments received by the Lender to obligations other than the Guaranteed Obligations; (k) any other action by the Lender, whether authorized by § 4 or otherwise, or any omission by the Lender or other failure of the Lender to pursue, or any delay in pursuing, any other Remedy in the Lender's power; or (l) any defense arising from a claim that the obligations of the Guarantor are greater than those of the Borrower or any other Loan Party.  Guarantor waives all rights and defenses arising out of any election of remedies by the Lender, even though that election of remedies, with respect to security for a guaranteed obligation, has destroyed the Guarantor's rights of subrogation and reimbursement against the principal by the operation of principles of subrogation, contribution, indemnification or otherwise.

     The Guarantor waives all rights and defenses that the Guarantor may have because the Borrower's debt is secured by real property.  This means, among other things:

     1.    The Lender may collect from the Guarantor without first foreclosing on any real or personal property collateral pledged by the Borrower.

     2.    If the Lender forecloses on any real property collateral pledged by the Borrower:

     (A)    The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price.

(B)   The Lender may collect from the Guarantor even if the Lender, by foreclosing on the real property collateral, has destroyed any right the Guarantor may have to collect from the Borrower.

This is an unconditional and irrevocable waiver of any rights and defenses the Guarantor may have because the Borrower's debt is secured by real property.

The Guarantor further waives:  (i) any defense to the recovery by the Lender against the Guarantor of any deficiency or otherwise to the enforcement of this Guaranty or any Security for this Guaranty after a disposition of any Security for any Other Obligations that is determined, for any reason, to not have been conducted in a commercially reasonable manner, even though, in the case of any such Security subject to the Uniform Commercial Code, such failure may prevent the Guarantor from exercising Reimbursement Rights against any other Loan Party; (ii) any rights, defenses or benefits that are or may be available to the Guarantor by reason of suretyship principles, or comparable provisions of the Laws of any other jurisdiction and all other suretyship defenses it would otherwise have under the Laws of Florida or any other jurisdiction; (iii) all benefits of any statute of limitations affecting the Guarantor's liability under or the enforcement of this Guaranty or any Other Obligations or Security; (iv) all setoffs and counterclaims; (v) promptness, diligence, presentment, demand for performance and protest; (vi) notice of nonperformance, default, acceleration, protest or dishonor; (vii) except for any notice otherwise required by applicable Laws that may not be effectively waived by the Guarantor, notice of sale or other disposition of any Security; and (viii) notice of acceptance of this Guaranty and of the existence, creation or incurring of new or additional Guaranteed Obligations, and all other notices of any kind with respect to any Other Obligations.

6.   Waiver of Reimbursement Rights.  Until all Other Obligations have been paid and performed in full, the Guarantor shall not exercise any rights of subrogation, reimbursement, contribution or indemnification or any similar rights or remedies (collectively, "Reimbursement Rights") against any other Loan Party, and waives any right to enforce any Remedy which the Lender now has or may in the future have against any other Loan Party and any benefit of, and any right to participate in, any Security or Other Obligations now or in the future held by the Lender.  If the Guarantor nevertheless receives payment of any amount on account of any such Reimbursement Rights or otherwise in respect of any payment or performance by the Guarantor of any Guaranteed Obligations prior to payment and performance in full of all Other Obligations, such amount shall be held in trust for the benefit of the Lender and immediately paid to the Lender for application to the Other Obligations in such order and manner as the Lender may determine.

7.   Representations of the Guarantor.  The Guarantor represents and warrants to the Lender that:  (a) this Guaranty is executed at the request of the Borrower; (b) the Guarantor has established adequate means of obtaining from any other Loan Parties on a continuing basis information pertaining to, and is now and on a continuing basis will be completely familiar with, the financial condition, operations, properties and prospects of such other Loan Parties; (c) the Guarantor has received and approved copies of all of the other Loan Documents; and (d) no oral promises, assurances, representations or

warranties have been made by or on behalf of the Lender to induce the Guarantor to execute and deliver this Guaranty.

8.    <u>Financial Statements and Tax Returns</u>.  The Guarantor hereby agrees to deliver to the Lender, the following: (a) within one hundred twenty (120) days after the end of each fiscal year of the Guarantor for so long as any portion of the Loan is outstanding, Financial Statements for the Guarantor, in form and detail satisfactory to the Lender, for and as at the end of such fiscal year; (b) within forty-five (45) days after the end of each fiscal quarter of the Guarantor for so long as any portion of the Loan is outstanding quarterly Financial Statements in form and detail satisfactory to Lender, for and as at the end of such fiscal quarter; (c) within thirty (30) days of the date when due, Tax Returns for the Guarantor; and (d) upon request by the Lender from time to time, copies of audited Financial Statements prepared by the Guarantor, in each case certified in a manner acceptable to the Lender. All Financial Statements for Guarantor shall include, without limitation, a calculation of Guarantor's Tangible Net Worth and Liquidity as defined in Exhibit D, Section G.2 of the Agreement.

9.    <u>Indemnification by the Guarantor</u>.  Without limitation on any other obligations of the Guarantor or Remedies of the Lender under this Guaranty, the Guarantor shall indemnify, defend and save and hold harmless the Lender from and against, and shall pay on demand, any and all losses, liabilities, damages, costs, expenses and charges (including the reasonable fees and disbursements of the Lender's legal counsel and the reasonable charges of the Lender's internal legal counsel) suffered or incurred by the Lender as a result of (a) any failure of any Guaranteed Obligations to be the legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with their terms, except as enforcement may be limited by bankruptcy, insolvency or other similar Laws affecting the rights of creditors generally, or (b) any failure of the Borrower to pay and perform any Guaranteed Obligations in accordance with the terms of such Guaranteed Obligations.

10.    <u>Rights of Setoff</u>.  Upon the occurrence and during the continuance of any Event of Default, the Lender is authorized at any time and from time to time to the fullest extent permitted by applicable Laws, and without notice or demand, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Lender to or for the credit or account of the Guarantor against any and all obligations of the Guarantor under this Guaranty.

11.    <u>Waivers and Amendments</u>.  No supplement to, modification or amendment of, or waiver, consent or approval under, any provision of this Guaranty shall be effective unless in writing and signed by the Lender, and any waiver, consent or approval shall be effective only in the specific instance and for the specific purpose for which given.

12.    <u>Remedies</u>.  Each of the Remedies provided in this Guaranty is cumulative and not exclusive of, and shall not prejudice, any other Remedy provided in this Guaranty or by applicable Laws or under any other Loan Document. Each Remedy may be exercised from time to time as often as deemed necessary by the Lender, and in such order and manner as the Lender may determine. No failure or delay on the part of the Lender in exercising any Remedy shall operate as a waiver of such Remedy; nor shall any single or partial exercise of any Remedy preclude any other or further exercise of such Remedy or of any other Remedy.

13.    Costs and Expenses.  The Guarantor shall pay to the Lender on demand all costs, expenses and charges of the Lender in connection with the enforcement of, or the exercise of any Remedy or any other action taken by the Lender under or in connection with, this Guaranty or any Guaranteed Obligations, including the reasonable fees and disbursements of the Lender's legal counsel and other out-of-pocket expenses, and the reasonable charges of the Lender's internal legal counsel.

14.    Notices.  All notices and other communications provided under this Guaranty shall be in writing and mailed or delivered to the Guarantor at the address set forth on the signature page of this Guaranty or at any other address in the State of Florida as may be designated by the Guarantor in a written notice sent to the Lender in accordance with § 7.03 of the Agreement.  Any notice or other communication will be effective (a) if given by mail, on the earlier of receipt or the third day after deposit in the United States mails with first-class postage prepaid, or (b) if given by personal delivery, when delivered.

15.    Binding Agreement.  This Guaranty shall be binding on and inure to the benefit of the Guarantor and the Lender and their respective successors and assigns, except that the Guarantor shall have no right to assign any interest under this Guaranty without the prior written consent of the Lender.  The Lender may from time to time assign its interest under this Guaranty in whole or in part without notice to or the consent of the Guarantor.

16.    Multiple Guarantors.  If more than one Person signs this Guaranty as Guarantor, (a) the term "Guarantor" shall mean each such Person, (b) the obligations of each Guarantor shall be joint, several and independent, and (c) this Guaranty shall be construed and enforced as though each Guarantor executed a separate guaranty on the terms set forth in this Guaranty.

17.    Governing Law.  This Guaranty shall be governed by, and construed and enforced in accordance with, the Laws of Florida.

18.    Time of Essence.  Time is of the essence of each and every provision of this Guaranty.

19.    Nature of Waivers.  THE GUARANTOR HEREBY ACKNOWLEDGES THAT (A) THE GUARANTOR HAS CONSULTED WITH LEGAL COUNSEL TO UNDERSTAND THE FULL IMPACT OF THE WAIVERS MADE BY THE GUARANTOR PURSUANT TO THIS GUARANTY, INCLUDING THOSE SET FORTH IN §§ 2, 3, 4, 5, 6 AND 20 HEREOF, (B) THE GUARANTOR UNDERSTANDS THE FULL IMPACT OF SUCH WAIVERS, AND (C) SUCH WAIVERS HAVE BEEN KNOWINGLY AND WILLINGLY MADE BY THE GUARANTOR.

20.    Waiver of Jury Trial.  EACH OF THE LENDER AND THE GUARANTOR WAIVE TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING (INCLUDING COUNTERCLAIMS), WHETHER AT LAW OR EQUITY, BROUGHT BY THE LENDER OR THE GUARANTOR AGAINST THE OTHER ON MATTERS ARISING OUT OF OR IN ANY WAY RELATED TO OR CONNECTED WITH THIS GUARANTY, THE OTHER LOAN DOCUMENTS, THE LOAN OR ANY TRANSACTION CONTEMPLATED BY, OR THE RELATIONSHIP BETWEEN THE LENDER AND THE GUARANTOR OR ANY

OTHER LOAN PARTY OR ANY ACTION OR INACTION BY ANY PARTY UNDER, ANY
OF THE LOAN DOCUMENTS.

"GUARANTOR":

_____
Ganesan Visvabharathy, individually

Guarantor's Address:
_101 Bree Ridge Pkwy, # 306_
_____Brer Ridge, IL 60527_

# EXHIBIT B

AO 440 (Rev. 05/00) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

SUMMONS IN A CIVIL CASE

IBA, LLC, a Delaware limited
liability company

Plaintiff,

V.

GANESAN VISVABHRATHY,
an individual,

Defendant

CAS~
07CV6219
ASSI JUDGE ANDERSEN
DESI MAGISTRATE JUDGE KEYS
MAGI~ ... JUDGE:
MAGISTRATE JUDGE KEYS

TO: (Name and address of Defendant)

Ganesan Visvabharathy
7529 Ridgewood Ln
Burr Ridge, IL 60527-8022

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Gary L. Blackman (ARDC #6187914)
James G. Martignon (ARDC #6277974)
Levenfeld Pearlstein, LLC
2 N. LaSalle St., Ste. 1300
Chicago, IL 60602

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

MICHAEL W. DOBBINS, CLERK

KRYSTEN COPPOLETTA

_____
(By) DEPUTY CLERK

NOV 0 2 2007

_____
DATE

ClientCaseID:  GARY BLACKMUN
Law Firm ID:   LEVENFEL


*169684A*

CaseReturnDate:   12/28/07

**Affidavit of  Special Process Server**

# UNITED STATES DISTRICT COURT

Case Number **07CV6219**

I, MICHAEL P. FEEHAN

FIRST DULY SWORN ON OATH STATES THAT I AM OVER 18 YEARS OF AGE AND NOT A PARTY TO THIS SUIT AND IS A REGISTERED EMPLOYEE OF ILLINOIS DEPARTMENT OF PROFESSIONAL  REGULATION PRIVATE DETECTIVE AGENCY #117-001292 STERN PROCESS & INVESTIGATION LLC 205 W. RANDOLPH ST. #1210 CHICAGO IL 60606

# ABODE SERVICE

THAT I SERVED THE WITHIN     **SUMMONS AND COMPLAINT**

ON THE WITHIN NAMED  DEFENDANT    **GANESAN VISVABHRATHY**

PERSON SERVED          **SURIYA (WIFE)**

I SERVED A MEMBER OF HOUSEHOLD 13 YEARS OF AGE OR OLDER AT THE DEFENDANTS USUAL PLACE OF ABODE AND INFORMED THAT PERSON OF THE CONTENTS THEREOF AND FURTHER MAILED A COPY OF THE SUMMONS OR PROCESS IN A SEALED ENVELOPE WITH POSTAGE PREPAID TO THE DEFENDANT, AT HIS USUAL PLACE OF ABODE WITHIN TWO BUSINESS DAYS OF THE SERVICE.

UNCOOPERATIVE

That the sex, race and approximate age of the person whom I left the     **SUMMONS AND COMPLAINT**
are as follow:   **Sex**  FEMALE  **Race**  ARABIC      **Age**  51

  **Height**  5'3"     **Build**  MEDIUM     **Hair**  BROWN

LOCATION OF SERVICE      **7529  RIDGEWOOD LANE
BURR RIDGE, IL, 60527**

Date Of Service:    12/1/07          Time of Service:    9:15 AM       Date Of Mailing    12/2/2007

MICHAEL P. FEEHAN                                              12/3/2007

**Special Process Server**
P.E.R.C. #129-157466

Under penalties of perjury as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statement are true and correct, except as to matters therein stated to be on information and belief and such matters the undersigned certifies as aforesaid that he/she verily believes same to be true.

# EXHIBIT C

### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IBA, LLC, a Delaware limited<br>liability company | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | 07 C 6219 |
| | ) | |
| vs. | ) | Honorable Judge Wayne R. Andersen |
| | ) | |
| GANESAN VISVABHARATHY,<br>an individual | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |

## ATTORNEY'S AFFIDAVIT OF DEFAULTED PARTIES

I, James G. Martignon, attorney for Plaintiff, Indymac Bank, F.S.B., hereby certify that the following specific facts are applicable to the above captioned proceeding and brought to the attention of the Court for the purpose of entering judgment hereunder:

1.     The following is the date the Court obtained jurisdiction over the Defendant by service of summons, publication or otherwise:

| Defendants | Jurisdiction Date | Method of Service |
|---|---|---|
| Ganesan Visvabharathy | December 1, 2007 | Abode |

2.     The proof of service of the foregoing Defendant is attached hereto as Exhibit "1" and made a part hereof.

3.     The only appearance and answer which were timely filed are as follows:

| Defendants | Date of Appearance | Date of Answer |
|---|---|---|
| Ganesan Visvabharathy | None | None |

4.     A copy of the court docket dated January 2, 2008 showing no appearance or answers filed by the Defendants is hereto as Exhibit "2".

LP  1510215.1 \ 31849-73240

I, James G. Martignon, attorney at law and counsel for the Plaintiff, hereby certify to the best of my knowledge, the above to be true and correct as of January 2, 2008.

/s/ James G. Martignon
James G. Martignon

# EXHIBIT 1

ClientCaseID: GARY BLACKMUN
Law Firm ID: LEVENFEL



\* 1 6 9 6 8 4 A \*

CaseReturnDate: 12/28/07

**Affidavit of Special Process Server**

# UNITED STATES DISTRICT COURT

Case Number **07CV6219**

I, MICHAEL P. FEEHAN

FIRST DULY SWORN ON OATH STATES THAT I AM OVER 18 YEARS OF AGE AND NOT A PARTY TO THIS SUIT AND IS A REGISTERED EMPLOYEE OF ILLINOIS DEPARTMENT OF PROFESSIONAL REGULATION PRIVATE DETECTIVE AGENCY #117-001292 STERN PROCESS & INVESTIGATION LLC 205 W. RANDOLPH ST. #1210 CHICAGO IL 60606

# ABODE SERVICE

THAT I SERVED THE WITHIN       **SUMMONS AND COMPLAINT**

ON THE WITHIN NAMED DEFENDANT    **GANESAN VISVABHRATHY**

PERSON SERVED       **SURIYA (WIFE)**

I SERVED A MEMBER OF HOUSEHOLD 13 YEARS OF AGE OR OLDER AT THE DEFENDANTS USUAL PLACE OF ABODE AND INFORMED THAT PERSON OF THE CONTENTS THEREOF AND FURTHER MAILED A COPY OF THE SUMMONS OR PROCESS IN A SEALED ENVELOPE WITH POSTAGE PREPAID TO THE DEFENDANT, AT HIS USUAL PLACE OF ABODE WITHIN TWO BUSINESS DAYS OF THE SERVICE.

UNCOOPERATIVE

That the sex, race and approximate age of the person whom I left the    **SUMMONS AND COMPLAINT**
are as follow:

| | | | | | |
|---|---|---|---|---|---|
| **Sex** | FEMALE | **Race** | ARABIC | **Age** | 51 |
| **Height** | 5'3" | **Build** | MEDIUM | **Hair** | BROWN |

LOCATION OF SERVICE        **7529  RIDGEWOOD LANE
BURR RIDGE, IL, 60527**

Date Of Service:    12/1/07         Time of Service:    9:15 AM      Date Of Mailing    12/2/2007

_(signature)_

MICHAEL P. FEEHAN                  12/3/2007

**Special Process Server**
P.E.R.C. #129-157466

Under penalties of perjury as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statement are true and correct, except as to matters therein stated to be on information and belief and such matters the undersigned certifies as aforesaid that he/she verily believes same to be true.

_(signature)_

# EXHIBIT 2

KEYS

# United States District Court
## Northern District of Illinois - CM/ECF LIVE, Ver 3.0 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:07-cv-06219

IBA, LLC et al
Assigned to: Honorable Wayne R. Andersen
Cause: 28:1332 Diversity-Breach of Contract

Date Filed: 11/02/2007
Jury Demand: None
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**IBA, LLC**
*a Delaware limited liability company*

represented by **Gary Irwin Blackman**
Levenfeld Pearlstein
2 North LaSalle Street
13th Floor
Chicago, IL 60602
(312)346-8380
Email: gblackman@lplegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James G Martignon**
Levenfeld Pearlstein, LLC
2 North LaSalle Street
Suite 1300
Chicago, IL 60602
(312)346-8380
Email: jmartignon@lplegal.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Ganesan Visvabharathy**
*an individual*

represented by **Ganesan Visvabharathy**
PRO SE

| Date Filed | # | Docket Text |
|---|---|---|
| 11/02/2007 | 1 | COMPLAINT filed by IBA, LLC; Filing fee $ 350 (Exhibits). (Poor Quailit Orginal - Paper Document on File)(tlm) Modified on 11/5/2007 (tlm). (Entered: 11/05/2007) |
| 11/02/2007 | 2 | CIVIL Cover Sheet. (tlm) (Entered: 11/05/2007) |
| 11/02/2007 | 3 | ATTORNEY Appearance for Plaintiff IBA, LLC by James G Martignon. (tlm) (Entered: 11/05/2007) |
|  |  |  |

| 11/02/2007 | 4 | ATTORNEY Appearance for Plaintiff IBA, LLC by Gary Irwin Blackman. (tlm) (Entered: 11/05/2007) |
| 11/02/2007 | 6 | RULE 7.1 and LOCAL Rule 3.2 Disclosure STATEMENT by IBA, LLC. (tlm) (Entered: 11/05/2007) |
| 11/05/2007 | | SUMMONS issued, 2 and 2 copies, as to Defendant Ganesan Visvabharath. tlm) (Entered: 11/05/2007) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/02/2008 09:25:52 | | |
| **PACER Login:** | lp0214 | **Client Code:** |
| **Description:** | Docket Report | **Search Criteria:** | 1:07-cv-06219 |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |